457 So.2d 37 (1984)
Joseph S. MAUMUS
v.
DEPARTMENT OF POLICE, NEW ORLEANS.
No. CA 1558.
Court of Appeal of Louisiana, Fourth Circuit.
July 31, 1984.
Rehearing Denied October 29, 1984.
*39 S.C. Garcia, III, Basile J. Uddo, Mandeville, for appellant.
Salvador Anzelmo, City Atty., Harold D. Marchand, Asst. City Atty., New Orleans, for appellee.
Before REDMANN, CIACCIO and KLEES, JJ.
CIACCIO, Judge.
Appellant, Police Officer Joseph Maumus, is a seven year veteran of the New Orleans Police Department who had earned an outstanding service record.
On September 11, 1982 Joseph Maumus was notified that he was being suspended from the New Orleans Police Department as a result of his conduct which allegedly violated Civil Service Regulations. Rule 2(1)(3), 3(6) and 4(3) of Orleans Parish Civil Service Commission Rules. Following a *40 hearing Maumus was notified by the Orleans Parish Superintendant of Police that he was being suspended for one hundred eleven days (i.e., from September 11, 1982 until December 20, 1982) and effective December 31, 1982, Maumus was being terminated from the New Orleans Police Department. He appealed this action to the Civil Service Commission.
The Civil Service Commission conducted a full evidentiary hearing on March 15 and 25, 1983. The Commission found the Appointing Authority had failed to prove (1) that Maumus violated the law by illegally possessing or distributing cocaine, [Rule 2 Sec. 1] (2) that he had been untruthful in responding to OMI agents regarding the cocaine, [Rule 2 Sec. 3] (3) that he had consumed alcoholic beverages while on duty, [Rule 3 Sec. 6]. The Commission did find that Maumus had not devoted his entire time to duty and for this reason they upheld his removal from employment with the New Orleans Police Department. We reverse the decision of the Civil Service Commission and reinstate Joseph Maumus, with all back pay and benefits, to his former position with the New Orleans Police Department.
We concur in the facts as found by the Commission and for this reason we incorporate its opinion in its entirety.

JOSEPH S. MAUMUS

VS.

DEPARTMENT OF POLICE

CIVIL SERVICE COMMISSION

CITY OF NEW ORLEANS

NO. 1998 Police Officer Joseph Maumus was terminated from the New Orleans Police Department on December 31, 1982 for allegedly committing various infractions of disciplinary rules at the Fairmont Hotel on the evening of September 10, 1982. He has appealed this action to the Commission. The matter was assigned by the Civil Service Commission to a Hearing Examiner pursuant to Article X, Section 12 of the Constitution of the State of Louisiana, 1974. The hearing was held on March 15 and March 25, 1983. The testimony presented at the hearing was transcribed by a court reporter. A copy of the transcript and all documentary evidence have been reviewed by the three undersigned members of the Civil Service Commission.
In the apt words of counsel for the Appointing Authority, the "issue before the Commission ... is ... whether or not there is legal cause for the disciplinary action taken and if so, did the penalty fit the alleged violations of the Disciplinary Rules." The Appointing Authority alleged that Officer Maumus on the night in question unlawfully possessed a controlled substance, cocaine; drank alcoholic beverage while on duty; failed to devote himself entirely to his duty; and gave an untruthful statement to investigators of the Office of Municipal Investigation (OMI).
The record in this case is unusually voluminous. To complicate matters, much of the testimony given by the complainant in the OMI investigation appears to have been less than candid. Also, the procedural morass into which this OMI surveillance leads us is replete with pitfalls. However, alleged possession with intent to distribute cocaine is an extremely serious offense which requires our careful scrutiny.
Factually this much seems clear. On the evening of September 10, 1982, agents of the Office of Municipal Investigation secured Room 632 and adjoining rooms at the Fairmont Hotel. To furnish Room 632, the OMI provided champagne, two champagne glasses, and one tenant, a Ms. Julie Burden. Ms. Burden called Officer Maumus and solicited him to come visit "her" room at the Fairmont. Officer Maumus responded to the call.
One of the central factual issues in this case is the motivation for Maumus' visit to Room 632. According to the OMI, Maumus went with an intent to respond to Burden's telephoned request that Maumus *41 bring her some "baby powder", a term which the OMI agents interpreted to be a euphemism which had been arranged between Maumus and his friends in previous encounters with the drug cocaine. According to Maumus, he went to receive information about his stolen .38 caliber service revolver, which had been lost in Burden's presence some weeks before. It is undisputed that when Ms. Burden called Officer Maumus and asked him to come to Room 632, it was on the pretext that she could inform him as to the whereabouts of his service revolver.
When Officer Maumus arrived at the room, he was greeted by Ms. Burden attired in a skimpy, translucent negligee; she was by her own description very drunk, having consumed before Maumus' arrival a bottle of the OMI's champagne. Officer Maumus entered the room and briefly conversed with Ms. Burden. Not long after entering the room, however, Officer Maumus was paged on his beeper and left at least in part for the purpose of seeing about some repaired tack for his horse. (At the time of the events herein described, Officer Maumus was assigned to the Mounted Patrol Division of the Police Department.)
Maumus later returned to the room and apparently shortly thereafter disrobed, leaving his service revolver, beeper, and identification wallet somewhere across the room from the bed. Almost immediately, Maumus' beeper went off for a second time.
The OMI agents occupying the adjoining rooms had understood their cue for entering Room 632 to be a beeper signal sounded by OMI Deputy Director Raymond Reed.
There is evidence that the intent of the OMI was to hold back until cocaine was distributed, but Deputy Director Reed denies that objective. In any event, when Maumus' pager sounded, the OMI agents burst into the room with guns drawn. They witnessed Officer Maumus lying "buck naked" in bed with Ms. Burden. There is no dispute that at this precise moment Officer Maumus was in fact on duty. On Deputy Director Reed's instructions, Maumus was "arrested"[1], handcuffed, denied counsel, and interrogated by OMI special agents before he was permitted to don his uniform.

THE ENTRAPMENT DEFENSE
Counsel for Appellant in his post-hearing brief directs the Commission's attention to the "set-up" engineered by OMI which "entrapped" his client, a seduction which appellant believes would have ensnared any red-blooded American boy.
It is beyond dispute that Burden lured Maumus to her room with a promise to provide information relating to a legitimate police matter. It is also not disputed that the room to which Maumus was invited had been obtained by OMI and provided with a nearly nude, intoxicated, amorous and apparently very attractive woman, a bottle of champagne, two glasses, and a bed. It is claimed by OMI but denied by Maumus that the woman suggested to Maumus that cocaine would ensure her mood. There can be no doubt that this scenario goes beyond mere surveillance and enters the realm of inducement or enticement.[2]
We recognize that some of the more egregious offenses by police officers are also *42 the offenses usually committed behind closed doors, making detection of offending officers very difficult. Consequently, we acknowledge that police investigative agencies must be permitted to use reasonable investigative methods to satisfy the public policy in favor of detection and dismissal of offending police officers. Reasonable methods might in appropriate cases include enticement, solicitation, or even inducement to the commission of an offense. The question posed by the method utilized by the OMI in this case is, "How far shall they be permitted to go in the enticement of police officers to commit offenses?" At what point does the effect cease to be the prevention of offenses and become the instigation of the same offenses?
We are mindful that a greater latitude must be allowed under the Civil Service rules to an administrative investigation of police officers than would be allowed under criminal law to a police investigation of private citizens. Yet few would argue but that a line must be drawn. We deem it appropriate in this case to examine the parameters of appropriate enticement in the investigation of police offenses.
We think it logical to conclude that where an offense is committed which the officer would not have done except for the persuasion of the investigators, the investigators and not the offender bear the responsibility for the commission of the offense. It follows, then, that in order to justify the use of instigation as an investigative tool in a particular case, the investigators must have reasonable grounds to believe that an offense of the sort instigated is frequently committed or is about to be committed by the police officer induced.
Thus, solicitation of Officer Maumus to obtain and distribute illicit drugs, and to engage in on-duty sex and alcohol consumption may be shown to have been improper inducement under the circumstances of this case only if it is established by the appellant that OMI had no reasonable cause to believe that Officer Maumus customarily or currently engaged in such offenses. We will examine each distinct offense to determine whether the absence of probably cause for its inducement is shown in the record and to determine whether the offense was proved.
Before we begin that examination, however, it is appropriate to note the factors limiting our examination of the extent to which probable cause supported inducement of particular offenses in this case. The record does not contain the statement given by Debra Bryant to OMI Special Agent Robert Mehrtens on September 3, 1982, which initiated the OMI investigation and would be evidence of the particular offenses for which probable cause existed to investigate Officer Maumus. The statement was excluded on the motion of counsel for appellant. Counsel for the city made no claim as to the relevance of the document, was content to withdraw the document, and made no proffer. Apparently both parties preferred to have the Commission review probable cause on the basis of testimony in the record.
The record shows conclusively that Ms. Bryant when she filed her complaint did not intend to complain concerning drug abuse, on-duty sex, or on-duty alcohol consumption by Joe Maumus. Her complaints to OMI concerned threats of arrest for theft of his handgun which Maumus had directed toward Bryant's girlfriend, Julie Burden; and a related telephone call to Bryant which included a threat of harm to Bryant, which she believed had been placed by Maumus. She testified there were no other reasons she went to OMI.
Neither false threats of arrest for theft nor harassment of any sort formed any part of the gravamen for Officer Maumus' discharge. In fact, it appears likely that Ms. Burden did in fact take the gun. Ms. Bryant described Burden as a kleptomaniac and acknowledged that Burden had attempted to sell a gun resembling Maumus' gun to a Huntsville acquaintance of the two women. Special Agent Mehrtens recovered from Ms. Burden a watch she had taken from Maumus during the Fairmont Hotel set-up. In relation to the telephone call, Ms. Bryant offered that she did not *43 know whether or not the telephone caller had been Maumus or one of several other men who might have benefited by alienating Bryant from Maumus, among whom were police officers who had described Maumus to Bryant as "Minyard's Monster" because of his usual assignment to assist Coroner Frank Minyard's office.
However, an administrative investigation of a police officer for departmental offenses, particularly those of such a serious nature as possession, use or distribution of cocaine, should not be limited to only those allegations intended to be raised by the complainant. Proper investigation into the background of the complaint may reasonably cause investigators to suspect offenses quite unrelated to the original cause for the complaint. There are some indications in the record that the Maumus investigation was such an investigation.
Four separate counts of violations of Departmental Rules by Officer Maumus were relied upon by the Department of Police to support the discharge of Maumus. Each count will be separately examined as to reasonable cause for inducement, considered as to balance of proof of violation, and where appropriate, weighed as to gravity:
(1) Violation of Departmental Rule 2., paragraph 1., relative to Adherence to Law, in that he had approximately .75 grams of cocaine in his possession on the evening of September 10, 1982.
(2) Violation of Departmental Rule 2., paragraph 3., relative to untruthfulness, in that he had given an untruthful statement to OMI agents regarding how the cocaine came into his possession.
(3) Violation of Departmental Rule 3., paragraph 6., relative to Use of Alcohol/On Duty, in that he had "consumed several glasses of champagne" while in the room that evening and while on duty.
(4) Violation of Departmental Rule 4., paragraph 3., relative to Devoting Entire Time to Duty, in that Maumus while on duty had been found "laying in bed, naked, in Room 632 of the Fairmont Hotel with a female, Julie Burden."

POSSESSION OF COCAINE
The record does disclose probable cause for the cocaine enticement. It appears from the testimony of both Ms. Bryant and Special Agent Mahrtens that Bryant had admitted to Mehrtens that she, Burden and Maumus had been together on occasions when cocaine was used. Burden contended her statement had been given when she was intoxicated; there is ample background, motive and inconsistent testimony in the record to suggest that both women may have perjured themselves on specific points; and it may have been the case that Maumus had only been in the vicinity when cocaine was used by others. However that may be, the record does disclose a reasonable basis for a belief that Maumus was customarily participating in cocaine use.
However, the set-up did not produce evidence to substantiate that belief. It is uncontroverted that Officer Maumus' wallet enfolded a clear packet containing a considerable amount (.75 grams) of cocaine. But there is no contention that he either used, distributed or offered to distribute the cocaine which remained in his identification wallet until removed by OMI special agents at the time of his "arrest".
It is plain that notwithstanding the belief of the OMI special agents that Maumus had left the hotel room to obtain cocaine for his liason with Julie Burden, Maumus when he returned did not even notify Julie Burden of the presence of the cocaine in his I.D. folder, nor did he remove it from his wallet before embracing Ms. Burden and joining her in bed. That he did not produce the cocaine or even mention it before tumbling into bed with Ms. Burden seems to belie any suggestion that he had intended to share it with her during their sexual encounter, or that he had brought it as a payment for Ms. Burden's favors. Under these circumstances, the only possible justification for the controlled substance count would be if Maumus' possession were per se unlawful. *44 Maumus testified that about an hour earlier than his visit to Julie Burden, he had become separated from his partner while patrolling the five to seven hundred blocks of Bourbon Street. Maumus had noticed four young men huddled around a car. He calmly approached the group astride his horse. The approach of Maumus, he testified, apparently spooked the young men and they fled. As they fled, he noticed an object drop to the pavement. Rather than pursue the group, he rode to the spot to examine the object left behind. At the location where the young men had been assembled, he found a brown or amber vial with a black plastic screw-on cap.
The vial had apparently been thrown to the ground out of fear of apprehension and the plastic cap had broken, spilling a white powdery substance on the ground. As it turned out, without dispute, this substance was cocaine. Officer Maumus dismounted and gathered the spilled cocaine into a cellophane wrapper. He placed the cellophane wrapper in his identification wallet; he tucked the broken, empty vial into his pants. Officer Maumus resumed his patrol; he did not convey the confiscated matter to the appropriate authorities of the New Orleans Police Department; he did not call his ranking officer to report the confiscation of contraband.[3]
Officer Maumus thus contends, without contradiction in the record, that the first time he responded to Ms. Burden's call beckoning him to the Fairmont Hotel, he had the recently confiscated cocaine in his possession. Whether Officer Maumus intended to convey this cocaine to Ms. Burden is the subject matter of conflicting testimony. OMI agents testified, since they were eavesdropping from the adjoining rooms, that Ms. Burden repeatedly asked the appellant if he had brought the "baby powder" for her. No witness claimed that the term cocaine was ever used by either Burden or Maumus. Maumus claims that he thought she was asking for a bath powder, such as Johnson & Johnson baby powder. He testified that he had never heard the term "baby powder" used as a euphemism for cocaine. Moreover, no expert or authority consulted during the hearing suggested that such a euphemism was in vogue. Debra Bryant had heard Burden use the term baby powder during their 8 year acquaintance, but she had never made the connection of the term "baby powder" with cocaine. Julie Burden stated several times in her deposition that she had never previously used the euphemism in the presence of Maumus.
The term simply was never established as a euphemism in general use or as a code developed between Burden and Maumus. Moreover, the context of Burden's questions and Maumus responses concerning Burden's desire for "baby powder" are consistent with Maumus' explanation of his understanding of the term. The Appointing Authority had the burden of proving that Officer Maumus intended to distribute the cocaine to Ms. Burden or to use it himself. This the Appointing Authority failed to do. It is entirely possible that Officer Maumus intended to distribute to Ms. Burden or use the cocaine in his possession; he could only have ruled out that possibility by delivering or reporting the contraband to headquarters. It is also possible that had the OMI delayed its entry into Room 632, Officer Maumus would have been caught in the act of distribution or use. However, the OMI entered prematurely, so that such possibilities must be relegated to speculation. Speculation is no basis for disciplinary action.

UNTRUTHFULNESS
If Officer Maumus gave an untruthful statement to OMI agents regarding how *45 the packet of cocaine came into his possession, he was not enticed or induced to do so. However, other perhaps even more troublesome issues are raised by the manner in which Officer Maumus was detained and questioned by OMI agents under the supervision of OMI Deputy Director Raymond Reed.
Four OMI agents burst into a private room of the Fairmont without warning. Reed detained and searched Maumus at gunpoint. Maumus' trousers were lifted so that their contents fell to the floor, and the contents were seized and examined. Maumus' identification wallet was searched and a packet of cocaine was removed and confiscated. He was detained for apparently over 8 hours, at least 4 hours in Room 632 and adjacent rooms of the Fairmont Hotel, before he was booked. He was denied counsel and interrogated by OMI agents, all the while he was required to remain nude. Whether such potential invasions of Officer Maumus' rights of freedom, privacy, and against self-incrimination can be conducted by OMI agents not acting under police authority is a question which must be answered in another forum.
Neither must we answer the difficult question of whether untruthful answers by a police officer to OMI agents under such circumstances, and unless directed to respond to OMI by a superior officer, would constitute a violation of Rule 2., paragraph 3. of the Police Department Rules and Regulations.
Maumus' version of the cocaine source was uncontradicted on the record.
Moreover, his version is supported, not contradicted, by the physical evidence shaken from Maumus' pocket at the time of his detention. If Maumus story of the aborted arrest were not true, what other explanation is available to explain why he had in his pocket an empty vial, with a jagged tip and a broken cap which made it impossible to secure the container? Why would he have kept such an item if he did not intend to turn it in as contraband? There simply was no evidence adduced at the hearing to convince us that Officer Maumus' version of how the cocaine came to be in his possession was untruthful.

USE OF ALCOHOL/ON DUTY
The OMI enticed Maumus to drink on duty by giving Julie Burden several bottles of champagne, asking her to invite Maumus to a hotel room for a legitimate police purpose, and then standing by while she offered him the champagne. We find no evidence in the record to show that the OMI had a reasonable basis for believing that Maumus customarily or currently drank alcoholic beverages while on duty. Consequently, we must conclude that the OMI improperly instigated Maumus to commit an offense which he might not have committed unless submitted to the inducement set up by OMI.
However, we do not find it necessary to determine whether the evidence produced by such improper instigation is fruit of the poisoned vine which must be excluded from consideration in this administrative proceeding before the Civil Service Commission. The evidence that Maumus drank champagne with Julie Burden in Room 632 on September 10 would not be convincing even if it were properly adduced.
Julie Burden, who had herself drunk a full bottle of the OMI's champagne before Maumus arrived, believed that Officer Maumus may have drunk a half glass of champagne. She also was so drunk that she did not realize that Maumus was naked when he got into bed with her. Indeed, the record makes it abundantly clear that even a sober Julie Burden is a totally unreliable witness. None of the eavesdropping OMI agents were in a position to see Maumus drink champagne. Of course, he denied doing so. Two glasses, with some champagne remaining in each, were found after the interlude was interrupted. None bothered to rule out the possibility that Burden had drunk out of each; after all she had been drinking for some time before Maumus arrived. Statements by the OMI eavesdroppers that they "heard him drink a glass of champagne" is not the stuff of a convincing disciplinary case, particularly *46 when strategically placed tape recorders captured no incriminating recordings corroborating what they thought they overheard. The consumption of alcohol count is dismissed.

* * *

NEGLECT OF DUTY
There is no doubt but that Officer Maumus was naked in bed with Julie Burden in Room 632 of the Fairmont Hotel while his horse was downstairs tied to a garbage truck in a service alley next to the hotel. It is hard to imagine how he was serving either the citizens or the City of New Orleans by engaging in a sexual liason with Ms. Burden. Officer Maumus at the hearing never denied neglecting his duties to engage in at least the preliminaries of sexual relations with Ms. Burden, explaining that he was "only human".
To state that Officer Maumus was enticed to be inattentive to duty would be a gross understatement. Julie Burden approached her tasks the evening of September 10, 1982 with a remarkable passion. But references by Bryant and Burden to on-duty swimming engagements and cocaine parties which included Maumus were ample reason to have given OMI cause to believe that Maumus had succumbed to "human" temptations while on duty on several previous occasions.
Nevertheless, we felt that the seduction in this case was unwisely zealous. Such that had Ms. Burden been successful in sweeping Maumus off his feet and into bed as soon as he entered the door in response to a legitimate police call, although we would not have condoned the offense, we might have mitigated the penalty to a reinstatement without back pay.
But Maumus' beeper saved him from the heat of the moment. He was called away to care for his horse's tackle. After he left, he had ample opportunity to recompose himself and regain his professional restraint and discretion. Thus, when he returned to Room 632, he did so with the full intent to engage in sex with Julie Burden, all pretense of their discussing his lost weapon having been stripped away by their first meeting that evening. He failed even to delay the daliance until he was relieved from duty.
There is always world enough and time enough for this sort of activity, but not at the expense of the citizenry of New Orleans. Notwithstanding the credible testimony of fellow police officers and Coroner Frank Minyard praising the police work of Joseph Maumus, we simply cannot mitigate the discharge of an on-duty policeman who strips and climbs into bed with a woman in a hotel room while he is expected to be protecting and serving the public.
For the foregoing reasons, the removal of Officer Joseph Maumus from employment with the New Orleans Police Department is sustained.

* * *
The appellant contends that the Commission erred in concluding that Officer Maumus had not been entrapped into neglecting his duties. We agree. The Commission found that "the seduction in this case was unwisely zealous", and, had Maumus succumbed to the initial seduction, the Commission might have mitigated the penalty to a reinstatement without back pay. Thus, the Commission found that Maumus had been entrapped in his initial encounter with Ms. Burden but concluded that the entrapment defense was no longer valid after Maumus left the hotel room and subsequently returned. In so holding, we find that the Commission erred, as a matter of law.
We agree with the Civil Service Commission that the defense of entrapment may be raised in a Civil Service disciplinary proceeding. The considerations, in a defense of entrapment, are set forth in State v. Bernard, 441 So.2d 817 (La.App., 3rd Cir., 1963) as follows:
Under the generally accepted view an entrapment is perpetrated when a law enforcement official or a person acting in cooperation with such an official for the purpose of obtaining evidence of the commission of an offense, solicits, encourages, *47 or otherwise induces another person to engage in conduct constituting such offense when he is not then otherwise disposed to do so. State v. Batiste, 363 So.2d 639 (La.,1978). When entrapment is at issue, the focal point of the inquiry is on the predisposition of the defendant to commit the crime at issue as well as on the conduct of the police. State v. Batiste, supra. For entrapment to exist, a defendant must be induced in some way to engage in criminal conduct which he is not otherwise disposed to engage in; an entrapment defense will not lie if the officers or agents have merely furnished a defendant, who is predisposed to commit the crime, the opportunities to do so. State v. Moody, 393 So.2d 1212 (La.,1981).
In the instant case the defendant had a legitimate purpose in visiting Julie Burden on the day in question. That is, he was attempting to secure information concerning his missing service revolver. Due to his prior association with Debra Bryant, a girlfriend of Ms. Burden, Maumus had reason to believe that Ms. Burden knew the whereabouts of his revolver. Ms. Burden admitted that she had professed knowledge of the whereabouts of the gun when she contacted Maumus.
Maumus testified in a statement given to the Office of Municipal Investigation (OMI) and at the hearing before the Commission that Burden had told him she had information about his revolver and it was in an attempt to discuss this matter that he visited Ms. Burden. On the first visit to question her, Ms. Burden began to seduce Maumus before he had an opportunity to inquire about his revolver. He was called from the room when he was notified that his horse had broken its tackle. Ms. Burden did not tell Maumus he need not return if he left her to attend to his horse. She also did not tell him she did not have the information he sought. The subject of the revolver had not yet been discussed.
Maumus secured his horse and, while awaiting the delivery of the tackle, he again returned to Burden's room to pursue the investigation concerning the whereabouts of his revolver. In this regard Maumus testified as follows:
Q. Okay. What did you do at that point Officer Maumus?
A. I went back up to Room 632.
Q. Why did you go back up to Room 632?
A. To see if I could find out where my gun was.
Q. When you got back to Room 632, Officer Maumus, did you discuss baby powder at all, or anything else?
A. No, sir.
Q. What was discussed when you got back to Room 632?
A. My weapon.
Q. Your weapon was discussed?
A. Yes, sir.
Q. Did you retrieve your weapon from Mrs. Burden?
A. No, sir, I did not.
Q. What exactly happened while you were discussing the weapon?
A. I was sitting in a chair. She began rubbing my legand rubbing my penisand putting her tongue into my earshe sexually aroused me.
Under these facts we conclude that Maumus did not possess a predisposition to commit the employment violation of neglect of duty. Until the point where Maumus did succumb to Ms. Burden's sexual advances he was carrying out a legitimate police function. That is, he was investigating the possible theft of his service revolver. Under normal circumstances, however, when he disrobed and proceeded to enter Ms. Burden's bed he would have been in dereliction of his duties as a police officer. However, in this case we find that Officer Maumus' actions resulted from entrapment, that is, they were a direct concomitant of the inducement set up by the Office of Municipal Investigation, through the use of their de facto agent, Julie Burden.
In the instant case the Office of Municipal Investigation did much more than provide a willing participant with an *48 opportunity to commit an offense to which he was predisposed. It did solicit, encourage and otherwise induce Officer Maumus to engage in conduct violative of his employment responsibilities.
The record clearly establishes that the Office of Municipal Investigation procured the services of Julie Burden with full knowledge that she was in a position to possess information concerning an issue of interest to Officer Maumus, namely, information concerning his missing service revolver. They encouraged her to contact Officer Maumus on the pretense of providing him with this information. They procured a room for Ms. Burden at the Fairmont Hotel and adjoining rooms for themselves. They tapped the telephone and placed a tape recorder under the bed. They picked up Ms. Burden and delivered her to the hotel room. The Office of Municipal Investigation provided the champagne and two champagne glasses. They presented Ms. Burden, dressed in a negligee. They encouraged their de facto agent, Julie Burden, to lure Officer Maumus into her bedroom with promises of information regarding his stolen revolver. Upon his arrival, she was allowed to proceed to entice him and to use her sexual persuasion in order to encourage him and thereby induce him to neglect his duties as a police officer. These actions on the part of the Office of Municipal Investigation constitute entrapment. This governmental agency orchestrated the entire scenario which resulted in Officer Maumus' succumbing to a sexual enticement which was in violation of his police duties.
The entrapment actions of the Office of Municipal Investigation did not cease when Officer Maumus left the hotel room for the first time. Rather, they continued, for Ms. Burden never told Maumus not to return if he left her to attend his horse. More importantly, she had not yet given him information concerning the weapon, nor had she informed him that she did not possess the information that he sought. The entrapment continued and for this reason we find that the Commission erred when it found that, by his subsequent return to the room and submission to Ms. Burden's advances, that Officer Maumus' neglect of duty was not the result of entrapment.
Moreover, assuming for the sake of argument that Officer Maumus was predisposed to commit neglect of duty when he visited Ms. Burden's room for the second time, we find that this factor is immaterial in view of the governmental misconduct on the part of the Office of Municipal Investigation. Specifically, the conduct of this governmental agency was so pervasive and over reaching as to preclude disciplinary action against this police officer.
That is, state and local governments are regulated in their conduct towards individuals by the Fourteenth Amendment of the United States Constitution, which provides, in pertinent part:
... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

* * *
The concept of "due process" is rooted in the canons of decency and fairness which express the notions of justice of English speaking people. U.S.C.A.Cons. Amend. 14. See: Rochin v. People of Calif., 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). The courts, through the exercise of their judicial power are responsible for insuring that fundamental fairness is preserved. See: United States v. Graves, 556 F.2d 1319 (5th Cir., 1977).
In certain prescribed instances the Government is estopped from bringing a prosecution because of their own misconduct. See: Rochin v. People of California, supra. Hampton v. U.S., 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); U.S. v. Graves, supra. The involvement of the government agents in a crime will bar prosecution if the methods used violate *49 fundamental fairness and due process so as to be characterized as too over reaching. See: Rochin v. People of California, supra; Hampton v. U.S., supra. In determining the propriety of the government's conduct the courts must engage in a balancing act wherein they weigh the objectives of keeping the trial process as an efficient means of determining truth against the need for keeping law enforcement practices at a level consistent with standards of society. See: Tate v. U.S., 283 F.2d 377 (D.C.Cir.,1960). That is, the courts must balance the societal interest of punishing wrongdoers against the rights of citizens to be free from government-induced criminality. See: U.S. v. Archer, 486 F.2d 670 (2nd Cir.,1973).
There is a distinction between "governmental misconduct" and "entrapment" and although the two concepts are similar there exists a major distinguishing characteristic. The defense of entrapment, like the defense of governmental misconduct, is a court created limitation on government activities. See: Ainsworth v. Reed, 542 F.2d 243 (5th Cir.) cert. den. 430 U.S. 917, 97 S.Ct. 1332, 51 L.Ed.2d 596 (1976). Both defenses arise from a strong policy consideration which necessitates fairness. See: U.S. v. Pinciotti, 339 F.2d 102 (6th Cir., 1964), cert. den., 382 U.S. 819, 86 S.Ct. 44, 15 L.Ed.2d 65 reh. den. 382 U.S. 933, 86 S.Ct. 309, 15 L.Ed.2d 345 (1964).
The point of divergence with regard to the two defenses is in the proof required. In order to prevail on the issue of entrapment, one must prove: (1) inducement by the government and (2) lack of a predisposition by the defendant to commit the particular acts. State v. Bernard, supra. See: Lopez v. U.S., 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963). The lack of predisposition by the defendant to commit the particular acts charged is of no moment when the issue of governmental misconduct is considered. Rochin v. People of California, supra. Rather, the thrust of the defense of governmental misconduct is upon the activities of the government agents. See: Rochin v. People of California, supra. U.S. v. Smith, 538 F.2d 1359 (9th Cir., 1976). The defendant will prevail on the issue of governmental misconduct if it is shown that the conduct of the governmental agents is so intrusive and over-reaching as to be violative of the principles of fairness and due process. Rochin v. People of California, supra; Hampton v. U.S., supra.
In the instant case the Office of Municipal Investigation did in fact exceed the bounds of legal propriety. Their tactics of inducement were so pervasive as to constitute governmental misconduct. Fundamental fairness does not permit us to contenance such egregious conduct within the framework of criminal prosecutions, nor shall we do so within the framework of municipal disciplinary actions. It would be a denial of due process to allow an individual to be disciplined (and thereby, to forfeit his livelihood) as a result of such governmentally created violations of employment regulations.
Policemen are guaranteed the same basic constitutional rights as are private citizens and they do not forfeit these rights by taking their oath of office, donning their uniform or assuming the hazardous, though sometimes thankless, duties of their profession.
Accordingly, for the reasons assigned, the ruling of the Civil Service Commission is hereby reversed and Officer Joseph Maumus is reinstated to his prior position with the New Orleans Police Department with all back pay and benefits.
REVERSED.
REDMANN, C.J., dissents with reasons.
REDMANN, Chief Judge, dissenting.
"To state that Officer Maumus was enticed to be inattentive to duty would be a gross understatement. Julie Burden approached her tasks the evening of September 10, 1982 with a remarkable passion. But references by [her friend Debra] Bryant and Burden to on-duty swimming engagements and cocaine parties *50 which included Maumus were ample reason to have given OMI cause to believe that Maumus had succumbed to `human' temptations while on duty on several previous occasions.
"Nevertheless, we felt that the seduction in this case was unwisely zealous. Such that had Ms. Burden been successful in sweeping Maumus off his feet and into bed as soon as he entered the door in response to a legitimate police call, although we would not have condoned the offense, we might have mitigated the penalty to a reinstatement without back pay."
But, the civil service commission reasoned, that was not the case before it. After being called from Julie Burden's hotel room by beeper on police business, and after being away for an hour to an hour and a half"ample opportunity," in the commission's words, "to recompose himself and regain his professional restraint and direction"Officer Maumus returned to her hotel room while still on duty, "with the full intent to engage in sex with Julie Burden, all pretense of their discussing his lost weapon having been stripped away...."
A reviewing court must affirm a civil service commission's factual findings unless clearly wrong, and affirm the commission's conclusions on the existence of legal cause and its commensurateness with the penalty imposed, unless "arbitrary, capricious, or characterized by abuse of discretion," Walters v. Department of Police, 454 So.2d 106, 113 (La.1984). One cannot so describe the commission's action in this case.[1]
The commission's action should be affirmed.
NOTES
[1] OMI agents did not at the hearing claim arrest authority. The City ordinance which created the OMI expressly denied that agency the power of arrest. New Orleans Ordinances, art. xi, Sec. 2-74(b).
[2] OMI agents took care at the hearing to distance themselves from Ms. Burden's enticements, claiming they had asked her only to arrange a meeting to discuss the stolen weapon, did not suggest that she request cocaine, and were surprised when she changed into a negligee. Under ordinary circumstances when the persuasion under which an offender acts is provided by a private person, not an agent of the investigating agency, the offender can not claim impermissible entrapment. Here, however, even if we do not credit Burden's testimony that she was asked by OMI to see if she could get Maumus to bring her drugs, Reed and other agents condoned and assisted her seduction to a degree which made her their de facto agent to the extent that she enticed Maumus.
[3] At the hearing there was credible testimony that police officers routinely take as much as two or three days to turn in confiscated items. The circumstances of this case demonstrate just how unwise a practice that is, but it seems to be the way things are done. Even the OMI agent who took possession of the cocaine delayed turning it in for several hours. Moreover, Maumus indicated in his testimony that since he made no arrests he did not feel that the cocaine was of any evidentiary value such as to warrant expedited delivery to headquarters or notification of his ranking officer.
[1] One might argue the contrary in respect to the commission's substitution of what may be naiveté for the police department's expertise (recognized in Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)) in evaluating the explanation Maumus gave for having cocaine in his possessionan action the commission apparently took without looking at the evidence that the police department official saw. One might suppose, for example, that "a white powdery substance [spilled] on the ground" or the street will have noticeable dirt in it, and the absence of dirt would tend to support an inference that this cocaine had not been spilled on the ground. One might deem .75 grams a curiously precise quantity to have been scraped up off the ground. One might respond, to the commission's inquiry "what other explanation is available to explain why he had in his pocket an empty vial, with a jagged tip and a broken cap," that that material would afford to a guilty police officer a handy explanation of what he was doing with cocaine if he got caught. (Unless one assume innocence, the possibility of guilt makes that a possible explanation.) One might even deem pap (if not colostrum) that a grown man in Maumus's circumstances believed that Julie Burden wanted real baby powder when she asked him to bring baby powder (what a coincidence that he brought cocaine he seized on duty!). One need not, however, "reverse" the commission on this ground because the commission did uphold the police chief's firing Maumus on other grounds, and Walters requires affirmation of the commission's action on those grounds.