549 So.2d 351 (1989)
STATE of Louisiana, Appellee,
v.
Jerry KOTWITZ aka Jerry Kattwitz aka Jerry Kottwitz aka Jerry Rosen, Appellant.
No. 20514-KA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 1989.
Rehearings Denied September 21, 1989.
*354 Jay Nolen, Monroe, Hocker, Rodriquez & Morrow by Wesley H. Hocker, Houston, Tex., Robinson & Robinson by Donald J. Robinson, Monroe, and Jim Skelton, Houston, Tex., for appellant.
William J. Guste, Jr., Atty. Gen., Baton Rouge, T.J. Adkins, Dist. Atty. and Sp. Prosecutor, Appointed by Office of Atty. Gen., and Dan J. Grady, III, Asst. Dist. Atty., Ruston, for appellee.
Before HALL, C.J., and MARVIN and SEXTON, JJ.
HALL, Chief Judge.
The defendant, Jerry Kotwitz, was charged by bill of information with three counts of inciting a felony in violation of LSA-R.S. 14:28, and two counts of corrupt influencing in violation of LSA-R.S. 14:120. Following a jury trial, the defendant was found guilty of three counts of inciting a felony, one count of corrupt influencing and one count of attempted corrupt influencing. The defendant was sentenced to one year imprisonment at hard labor and a $1000 fine on each of the three counts of inciting a felony, four and one-half years imprisonment at hard labor, and a $5000 fine on the corrupt influencing count, and 18 months' imprisonment at hard labor and a $2500 fine on the attempted corrupt influencing count. The sentences were ordered to run concurrently. The defendant appealed from the convictions and sentences. As two of defendant's assignments of error have merit, the defendant's convictions on Count 3 for inciting a felony and Count 4 for corrupt influencing will be reversed. The remaining assignments of error have no merit and defendant's convictions and sentences on the three remaining counts will be affirmed.
Evidence
In the fall of 1984, James A. Norris, Jr., defeated the incumbent, Johnny Carl Parkerson, in the election for district attorney for the Fourth Judicial District. District Attorney Norris took office on January 1, 1985. (Trial testimony of DA Norris, R. p. 476). After the election, but prior to assuming office, district attorney Norris, while shopping for a vehicle at Ryan's Chevrolet in Monroe, met Bernard Presley, a salesman at Ryan. Presley had his picture taken with Norris and the photograph hung for a while at the dealership. (Trial testimony of Bernard Presley, R. p. 381-382; trial testimony of DA Norris, R. p. 477).
Sometime thereafter, the defendant heard rumors from either Andre Benjamin or Reginald "Fats" Brass that Presley claimed he had a photograph and information that connected DA Norris with cocaine use and homosexual activity. (Trial testimony of the defendant, R. pp. 659-660). Meanwhile, Presley had moved to Houston, Texas. (Trial testimony of Bernard Presley, R. p. 374). The defendant attempted to contact Presley in Houston, but he was unsuccessful. (Trial testimony of Bernard Presley, R. p. 458). Presley moved back to Monroe in 1986. (Trial testimony of Bernard Presley, R. p. 373).
Presley, who was living at the same apartment complex as defendant, ran into the defendant in June, 1987, and offered to give him a resumé for the purpose of seeking employment with the defendant. The defendant did not discuss employment with Presley, but told him that he had heard, while having lunch with Det. Major Donald M. Hill of the Monroe Police Department, that there was a warrant out for Presley's arrest. It was later discovered that there was no warrant out for Presley's arrest, although a complaint against Presley had been made to the Monroe Police. (Trial testimony of Bernard Presley, R. pp. 378-379).
Several days later, the defendant and Presley met again, with the defendant asking *355 Presley if he wanted to make some money. The defendant also said "We'd like to get [district attorney Norris] out of office." (Trial testimony of Bernard Presley, R. pp. 380-381). The defendant thought Presley had prior knowledge of district attorney Norris' use of drugs and sexual life, and told Presley that if he could get drugs on district attorney Norris or information about Norris and any homosexual activities, Presley would be paid a fee. (Trial testimony of Bernard Presley, R. pp. 381, 383-384). A couple of days later, Presley and the defendant agreed on a price of $7000 total, $2000 up front to be provided to Presley in exchange for this information. Presley testified that, if given the $2000, he would have left town. (Trial testimony of Bernard Presley, R. p. 387). He actually had no such information about Norris.
At the next meeting between Presley and the defendant, the two discussed acquiring cocaine to plant on district attorney Norris and on someone within the district attorney's office. Presley lied to the defendant and told him that he knew a black female in Norris' office. The defendant at first told Presley he would get the cocaine, but later agreed only to finance it. (Trial testimony of Bernard Presley, R. pp. 386-387).
Around the time the defendant and Presley first met, the defendant went to Major Hill and related to Major Hill the identity of Presley and the information about district attorney Norris. Major Hill was a close friend and business associate of defendant. Major Hill recommended that the defendant go to the FBI. (Trial testimony of Donald M. Hill, R. p. 634). Major Hill contacted Special Agent John M. Tanzy of the FBI. Shortly thereafter, the defendant met with Agent Tanzy, and discussed his knowledge of a person who had allegedly sold cocaine to DA Norris and an assistant district attorney. Agent Tanzy told the defendant that the FBI needed to meet his "source", that any expenditure by the defendant for the purchase of cocaine would be illegal, and if such a transaction were to take place, the FBI would want to control it. The defendant was specifically told not to furnish drugs or money for this scheme. (Trial testimony of John M. Tanzy, R. p. 532).
During the next several weeks, Presley and the defendant met regularly. The defendant found out that there was no black female investigator in the district attorney's office. (Trial testimony of Bernard Presley, R. pp. 388-389). Presley told the defendant that his contact was not an investigator, but Presley said he did know a black female who worked in the district attorney's office. As Presley did not have a contact in the district attorney's office, he stalled for time, refusing to give the name of his non-existent contact in the district attorney's office until the defendant told Presley who the defendant's associates in the scheme were. (Trial testimony of Bernard Presley, R. p. 389).
Around this time, Presley began to fear for his own safety and for the safety of his daughter. He knew that the defendant wanted more information and Presley did not have a black female contact in the district attorney's office, nor did he have any scandalous information on district attorney Norris. For this reason Presley, on August 13, 1987, contacted Monroe Attorney Oscar Barnes. (Trial testimony of Bernard Presley, R. pp. 390-393). Mr. Barnes contacted district attorney Norris and arranged a meeting between Presley and Norris. At two meetings, on August 13th and 14th, Presley explained the situation regarding the defendant to district attorney Norris. At that time, district attorney Norris offered Presley limited immunity if Presley would assist in an investigation of the defendant. Presley agreed to wear a body microphone during future meetings with the defendant. Additionally, district attorney Norris provided Presley with the name of a black female assistant district attorney, Kathy McCoy, to use as his so-called contact. (Trial testimony of Bernard Presley, R. p. 403; trial testimony of DA Norris, R. pp. 477-480).
Following the meeting with district attorney Norris, Presley, as agreed, began to wear a body microphone and his conversations with the defendant were thereafter recorded. At this time, Presley had a theft *356 charge pending in the Monroe City Court. Presley told the defendant that assistant DA McCoy had a cocaine habit, and the defendant proposed that they "test" Ms. McCoy by getting her to arrange for Presley's theft charge to be dismissed. This was to be in exchange for supplying Ms. McCoy with some cocaine. The defendant gave Presley $125 to purchase the cocaine. (Tape, August 19, 1987; trial testimony of Bernard Presley, R. p. 424; trial testimony of the defendant, R. p. 657; trial testimony of DA Norris, R. p. 490; trial testimony of Kathy McCoy, R. p. 471). Presley delivered the money to deputy sheriffs. To satisfy the defendant that Presley actually knew Ms. McCoy, Presley and Ms. McCoy were to have lunch together on August 19th at which time the cocaine was supposedly to be delivered to her. As previously agreed with the defendant, Presley called the defendant and left a message with his answering service regarding the time and place of Presley's lunch meeting with Ms. McCoy. Presley and Ms. McCoy were under the impression that the defendant, or an associate of his, would be at the restaurant to verify that Presley knew Ms. McCoy. The only person Presley and Ms. McCoy knew at the restaurant, and who would have known that Ms. McCoy was an assistant district attorney, was former DA Johnny Carl Parkerson. (Trial testimony of Bernard Presley, R. pp. 424-425; trial testimony of Kathy McCoy, R. pp. 471-472).
On August 18th or 19th, DA Norris informed FBI Special Agent Ken Roberson of their investigation of the defendant. Agent Roberson then briefed Agent Tanzy on this investigation, at which time Roberson learned of the prior meetings between special agents Tanzy and Jim Burks of the FBI and the defendant. On August 25th, the defendant spoke with Agents Tanzy and Burks, telling them "the cocaine deal" had "gone down" between his "informant" (Presley) and the "contact" in the district attorney's office (McCoy), but that the money to buy the cocaine had not been supplied by the defendant. (Trial testimony of Agent Tanzy, R. pp. 532, 543).
Subsequent meetings and telephone conversations between Presley and the defendant were recorded. On September 9, 1987, warrants were issued for the arrest of the defendant. On that date, the defendant was arrested and interviewed at length at the FBI offices and later at the district attorney's conference room by district attorney Norris, Special Agent Burks, and Sgt. Jay Via and Deputy Richard Medaries of the Ouachita Parish Sheriff's Department. At this interview, the defendant said he didn't give Presley any money for cocaine, but he had loaned him $125. Later, after the defendant was told that conversations between him and Presley had been recorded, the defendant recanted, and said he had given Presley the money to buy cocaine. The cocaine was to be given to Kathy McCoy as a test to see if she could ultimately be used to set up district attorney Norris. (Trial testimony of DA Norris, R. p. 489; trial testimony of Deputy Medaries, R. pp. 556-557).
Additionally, the defendant, at this interview, admitted that the person who was to ultimately pay Presley was J.B. Harrison. J.B. Harrison was in federal prison due to an embezzlement scheme whereby approximately five million dollars had been embezzled from a bank in Bastrop, Louisiana. Harrison, although in federal prison, also had been convicted of State charges involving the same scheme. His State sentence would not commence until his federal prison sentence had ended. The defendant said that Mr. Harrison felt like he would be pardoned and thereby avoid his State sentence if Norris were not the district attorney, because Norris would recommend that the Pardon Board not give Harrison a pardon. (Trial testimony of DA Norris, R. pp. 490-496; trial testimony of Deputy Medaries, R. p. 558).
Charges
The defendant was charged by bill of information with three counts of inciting a felony in violation of LSA-R.S. 14:28, and two counts of corrupt influencing in violation of LSA-R.S. 14:120. The charges were that the defendant incited and procured Presley to possess cocaine; that the defendant incited and procured Presley to distribute the cocaine to McCoy, and that *357 the defendant incited and procured McCoy to possess cocaine. Additionally, the State charged that the defendant gave Presley money for the purpose of corruptly influencing both DA Norris and assistant district attorney McCoy. A jury found the defendant guilty of the three counts of inciting a felony and one count of corrupt influencing (of Norris). The defendant was also found guilty of one count of attempted corrupt influencing (of McCoy).
Assignments of Error
The defendant's assignments of error, numbered 1-15, were filed in the district court. The issues presented in defendant's brief, for the most part, did not address the errors previously assigned by the defendant. For that reason, this court ordered the defendant to comply with LSA-C.Cr.P. Art. 844 by asserting in a formal written assignments of error all errors asserted in brief and not earlier assigned as such. Defendant filed his supplemental assignments of error. That document traced the issues the defendant presented in brief; additionally, the defendant reasserted all assignments of error contained in his August 3, 1988 filing. Those original assignments of error were not mentioned in brief, however, and are, therefore, deemed abandoned. State v. Domingue, 298 So.2d 723 (La.1974); State v. Williams, 338 So.2d 672 (La.1976). This opinion will deal with defendant's supplemental assignments of error, corresponding to the issues outlined in defendant's brief. Supplemental Assignment of Error: Issues 1 and 2:
"1) Was it outrageous governmental conduct for the district attorney, after learning of appellant's attempt to expose rumored illicit drug and sex habits about him, to
A) Instigate an investigation of appellant and play an integral and active role in conducting such investigation,
B) manufacture and stage a crime for the appellant to commit,
C) orchestrate efforts to deceive and encourage appellant to commit the manufactured and staged crime, and
D) play an integral and active role in interrogating, arresting, prosecuting, and convicting appellant on the manufactured and staged crime?
2) Was there sufficient evidence to overcome appellant's affirmative defense of entrapment where the appellant had no predisposition to commit the crime manufactured and staged by the district attorney as noted in Issue 1 above?"
By these two assignments of error, the defendant asserts that his conviction should be overturned based on the conduct of the district attorney. Defendant alleges that district attorney Norris' conduct constituted outrageous governmental conduct. The defendant also contends that there was insufficient evidence to overcome his affirmative defense of entrapment.
Entrapment and governmental misconduct are court-created limitations on government activities. Maumus v. Dept. of Police, New Orleans, 457 So.2d 37 (La. App. 4th Cir.1984), writ denied 461 So.2d 1054 (La.1985). A valid entrapment defense has two related elements: governmental inducement of the crime and a lack of predisposition on the part of the defendant to engage in criminal conduct. Mathews v. United States, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988). The entrapment defense will not lie if officers or agents merely furnish a defendant predisposed to commit the crime an opportunity to do so. State v. Moody, 393 So.2d 1212 (La.1981). The ultimate question, under the test for entrapment, is whether the inducement by the officers or the defendant's own predisposition caused the criminal conduct in question. State v. Batiste, 363 So.2d 639 (La.1978).
The relevant inquiry for a consideration of entrapment in this case is whether the defendant was predisposed to commit the crimes of inciting a felony and corrupt influencing. The jury could reasonably have found that an entrapment defense was not applicable in this case, as the State put on adequate evidence that the defendant was predisposed to commit the crimes charged. The evidence tended to prove *358 that the defendant became intrigued with Bernard Presley as soon as he heard the rumor that Presley had damaging information regarding district attorney Norris. This is apparent from the testimony that the defendant attempted to contact Presley in Houston before Presley and the defendant had even met. Additionally, when the defendant and Presley finally did meet, the defendant indicated that there was a warrant out for Presley's arrest. It is somewhat curious that the defendant was checking on Presley even before he met him. Even Presley testified that he found this curious. (R. p. 379). A jury could have reasonably found that some type of scheme to frame district attorney Norris or get some damaging information on him was already forming in the defendant's mind before he met Presley. Defendant pursued the matter with Presley after they met. Therefore, when district attorney Norris finally became involved in the investigation of the defendant, it is hard to believe that the defendant was not predisposed to commit the crimes. It must be remembered that district attorney Norris did not even learn about the defendant and Presley until August 13, 1987, when Presley met with district attorney Norris at the suggestion of Oscar Barnes. The facts indicate that the defendant was predisposed to commit the crimes prior to DA Norris entering the situation; therefore, the defense of entrapment is inapplicable.
All of the crimes of which the defendant was convicted stem from the defendant's desire to obtain damaging information on DA Norris. This scheme led the defendant to incite Presley to possess and distribute cocaine; it led the defendant to incite assistant district attorney Kathy McCoy to possess cocaine; and it led the defendant to give money to Presley to attempt to corruptly influence McCoy. The scheme was already in the defendant's mind when DA Norris became involved. As the defendant was predisposed to commit the crime before DA Norris entered the picture, the jury correctly found no entrapment.
The defendant also claims that, even if he were somewhat predisposed to commit the crimes, the actions of DA Norris constituted governmental misconduct sufficient to deprive him of due process and require reversal of his conviction. Governmental misconduct as a bar to conviction seems to have arisen as an offshoot to the entrapment defense. In United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the Supreme Court considered an entrapment defense in which there had been a finding that the defendant had been predisposed to commit the crime. The Court noted, at 93 S.Ct. 1643:
"While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), the instant case is distinctly not of that breed."
The Rochin case, cited in Russell, supra, involved a defendant who was suspected of selling narcotics. Three deputy sheriffs went to the house where the defendant lived along with his extended family. The deputies entered through the open front door to the house and then forced open the door into the defendant's room. On a nightstand next to the bed, the deputies saw two capsules and asked the defendant to whom the capsules belonged. Instead of answering, the defendant grabbed the capsules and swallowed them. The defendant was then handcuffed and taken to a hospital, where a doctor, at the direction of one of the deputies, forced an emetic solution into the defendant's stomach to induce vomiting. The two capsules were thereby recovered and were later determined to contain morphine. The capsules were later used at trial to obtain defendant's conviction. The Supreme Court determined that the due process clause of the Fourteenth Amendment prevented evidence obtained in such a manner to be used at trial against the defendant.
In Hampton v. United States, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the Supreme Court had an opportunity to reconsider the language cited above in Russell. *359 The plurality opinion in Hampton stated:
"... If the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law."
96 S.Ct. at 1650. However, a majority of the court was of the opinion that, under a given set of circumstances, the conduct of the government could bar conviction regardless of the defendant's predisposition to commit the crime. The dissent, in an opinion by Justice Brennan, joined by Justices Stewart and Marshall, felt that, in any entrapment situation, the focus should always be on the conduct of the government, rather than on the predisposition of the defendant. Justice Powell concurred with the judgment of the plurality, in an opinion joined by Justice Blackmun. However, Justice Powell did not agree with the plurality that the defendant's predisposition would always be the determinative factor:
"... I therefore am unwilling to join the plurality in concluding that, no matter what the circumstances, neither due process principles nor our supervisory power could support a bar to conviction in any case where the Government is able to prove predisposition."
Hampton, 96 S.Ct. at 1653 (Powell, J., concurring). It therefore appears that a majority of the Supreme Court would be willing to acknowledge a governmental misconduct defense separate and distinct from the defense of entrapment.
Governmental misconduct has been recognized as a possible defense by at least two Louisiana appellate courts. In Maumus, supra, a civil case, the appellant was a New Orleans police officer whose employment had been terminated. Appellant alleged that the actions which led to his dismissal constituted governmental misconduct. The facts showed that agents of the Office of Municipal Investigation (OMI) secured adjoining rooms at a hotel. In one room the agents placed champagne, two champagne glasses and a woman. The woman invited Maumus to come to the room, telling Officer Maumus that she had information as to the whereabouts of his missing service revolver. Maumus was greeted by a very drunk woman in a skimpy, translucent negligé. The OMI agents, in the next room, entered the room occupied by Maumus and the woman at the prearranged signal of Maumus' beeper going off. Maumus was found naked and in bed with the woman; all of this time he was supposed to be on duty. Maumus was subsequently dismissed from the New Orleans Police Department. The Fourth Circuit held that Officer Maumus should be reinstated to his former position, as the actions of the OMI and the woman, found to be the OMI's agent, constituted governmental misconduct.
In State v. Marks, 503 So.2d 32 (La.App. 1st Cir.1986), writ denied 506 So.2d 110 (La.1987), the First Circuit acknowledged that there could be cases of governmental misconduct, citing Maumus, but found that it had not been proven in that case. The First Circuit determined that warrantless electronic surveillance by a governmental agent engaging in a drug transaction with the defendant was not sufficiently extreme misconduct to constitute governmental misconduct. Additionally, the court found the defendant was an active participant in the offense and therefore was unable to avail himself of the governmental misconduct defense.
The requirement noted in Marks, supra, that the defendant may not avail himself of the governmental misconduct defense if he was an active participant in the crime stems from a line of U.S. Fifth Circuit Court of Appeal decisions. In that line of cases, the Fifth Circuit has noted that the governmental misconduct defense will only be available in the rarest and most outrageous circumstances. It requires not only government over involvement in the charged crime, but a passive role by the defendant. A defendant who actively participates in the crime may not avail himself of the defense. United States v. Yater, 756 F.2d 1058 (5th Cir.1985), cert. denied 474 U.S. 901, 106 S.Ct. 225, 88 L.Ed.2d 226 (1985); United States v. Nations, 764 F.2d *360 1073 (5th Cir.1985); United States v. Arteaga, 807 F.2d 424 (5th Cir.1986). The Ninth Circuit has stated that the governmental misconduct defense is generally unavailable where the criminal enterprise is already in progress before the government becomes involved. United States v. Stenberg, 803 F.2d 422 (9th Cir.1986).
In the instant case, the defendant has not shown governmental misconduct sufficient to render the conviction invalid. First, the defendant has not shown that the conduct of DA Norris in this situation was outrageous. Although perhaps it was unwise for DA Norris to investigate the defendant when it was apparent that Norris was the primary intended victim of the defendant's scheme (Norris was recused on his own motion from the prosecution of this case), there was no outrageous conduct on the part of the district attorney. The district attorney directed Presley to wear a body microphone, but this is not unusual or outrageous procedure in criminal investigations. (See Marks, supra.) The wearing of the body mike by Presley did not induce the defendant to commit any crime; its use was intended solely to keep an accurate record of everything the defendant said. The subterfuge whereby Presley was to buy cocaine for McCoy simply presented an opportunity for defendant to further his scheme against Norris. Additionally, DA Norris' use of assistant DA McCoy in the investigation did not constitute outrageous governmental misconduct. Assistant DA McCoy was predominantly used as simply a name for Presley to give to the defendant. Presley had already told the defendant he had a contact in the DA's office and Ms. McCoy fit the description previously provided by Presley of a black female. Again, Ms. McCoy did not induce the defendant to commit any crime. The conduct by the government in this case does not fit the description of the rarest or most outrageous conduct necessary to enable the defendant to claim governmental misconduct as a defense.
The defendant should also be barred from claiming governmental misconduct as a defense because he did not play a passive role in the crimes committed. As previously mentioned, the defendant sought out Presley and any information Presley had on DA Norris. Additionally, the testimony of Presley was that the defendant was the one to initially propose payment to Presley in exchange for damaging information on DA Norris. The defendant also did not play a passive role when he provided the money for Presley to supposedly buy cocaine for assistant DA McCoy. Finally, it seems that the criminal enterprise was already in progress before the government, through DA Norris, became involved.
Due to his predisposition to commit these crimes and his active involvement in them, the defendant is unable to avail himself of either the entrapment or governmental misconduct defenses. Therefore, these assignments of error lack merit.
Supplemental Assignment of Error: Issue No. 3
"Can an appellant be convicted of inciting a de facto state agent to commit a felony which was governmentally manufactured and induced?"
By this assignment of error, defendant's basic contention is that the State did not prove that the defendant incited Bernard Presley to commit a felony. Defendant's contention is that the facts of this case show that Presley solicited the defendant, rather than that the defendant solicited Presley. We find that there was sufficient evidence for the jury to reasonably have found that the State proved the defendant incited Presley to possess and distribute cocaine to McCoy, constituting felonies.
The standard of review for the sufficiency of the evidence is whether, viewing it in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Nealy, 450 So.2d 634 (La.1984).
LSA-R.S. 14:28 defines inciting a felony as "the endeavor by one person to incite or procure another person to commit a felony." The defendant seems to be contending *361 that there was insufficient evidence to find that he incited or procured Presley to commit a felony because Presley initially came up with the idea of purchasing the cocaine to give to Kathy McCoy. The question of who instigated the idea of obtaining the cocaine is unimportant; the crime of inciting a felony may be committed even though the person who was incited was the originator of the idea or plan to commit the felony.
No Louisiana cases were found considering the elements required for the State to prove guilt under LSA-R.S. 14:28. However, it seems that the Legislature, in enacting 14:28, was probably equally as concerned with a person encouraging another person who already had a preconceived idea of committing a felony to carry out that felony, as it was with a person planting the idea of committing a felony in a theretofore innocent-minded individual. If anything, the first situation would be the more dangerous and therefore the more in need of legislative proscription. In the second situation, in order for the felony to actually be committed, the inciter must convince another, with as yet no predisposition to commit the felony, to open his mind to the possibility of committing the crime and then encourage him to do so. In the first situation, the possibility that a felony will be committed seems much more eminent; in that situation the inciter is encouraging a person to commit a crime when the person solicited has already entertained such thoughts himself. Certainly, the Legislature, in enacting LSA-R.S. 14:28, was equally as concerned with both situations.
The defendant, in an attempt to rebut the above proposition, cites the reporter's comments to LSA-R.S. 14:28. The comments do state that inciting a felony will only be applicable where the person solicited is unwilling to commit the crime and/or where the person solicited has ignored the solicitor's request. However, the reasons for this statement are also explained in the comments. Should the person solicited agree to commit the offense, the inciter can be found guilty of conspiracy (LSA-R.S. 14:26). Should the person solicited actually commit the crime, the inciter would be guilty as a principal (LSA-R.S. 14:24).
The correct interpretation of inciting a felony was discussed in a Tulane Law Review article where it is stated:
"... the courts should not be required to construe narrowly the article defining the crime of `Inciting a Felony.' The word `inciting' should be given its clear, broad meaning. For example, the article should be held to include the activity of an offender who does not initiate the idea of committing a felony, but who urges and encourages another who had the original idea to carry it out. That is, `inciting,' in a very narrow sense, means to arouse to action by planting an idea, but in its broader and more familiar meaning, for which it was chosen by the draftsmen, it refers to any stimulation to action of anyone who is hesitating, no matter whose idea the proposed action was originally. By so holding, the judge is not creating a new crime; he is giving full effect to legislative language consciously chosen for its breadth in defining the crime. A narrow, restrictive construction would defeat the whole purpose of the article, and fatally affect the method of Code formulation the Reporters have tried to carry out."
Morrow, The Louisiana Criminal Code of 1942Opportunities Lost and Challenges Yet Unanswered, 17 Tu.L.Rev. 1, 9 (1942).
The reporter's comments to LSA-R.S. 14:28 note that inciting a felony is similar to the common law crime of solicitation. In a discussion of solicitation, at 21 Am. Jur.2d, Criminal Law § 162, it is noted:
"Solicitation is a substantive crime in itself, not an abortive effort to commit the crime solicited. The solicitor is guilty even though his solicitation was of no effect and the crime counseled was not committed. Indeed, the crime is complete when the solicitation is made; it is not necessary that any further steps be taken toward the consummation of the offense solicited."
The only reported appellate decision reviewing a conviction under this statute, State v. Roche, 341 So.2d 348 (La.1976), *362 also involved solicitation of a police undercover agent to commit a crime.
Considering, therefore, that it was unnecessary to prove that the defendant was the originator of the idea to provide Kathy McCoy with cocaine, there was sufficient evidence that the defendant was guilty of inciting Presley to possess and distribute cocaine even though Presley admitted that it was his idea to supply cocaine to Kathy McCoy (R. p. 438). The testimony of Presley, and defendant's admissions to Deputy Medaries and DA Norris that the defendant solicited Presley in a scheme to set up DA Norris and then gave $125 to Presley with the intention that Presley purchase cocaine to give to McCoy, is sufficient evidence for a jury to find that the defendant incited Presley to commit the felonies of possession and distribution of cocaine. The defendant was in essence soliciting Presley to possess cocaine and then to distribute that cocaine to McCoy. As to the counts charging defendant with inciting Presley to commit felonies, this assignment of error lacks merit.
However, the conviction of inciting Kathy McCoy to commit a felony, that is, possession of cocaine, must be reversed. Defendant never had any contact with McCoy; therefore it cannot be said that he incited or procured her to possess cocaine.
One could possibly incite another to commit a felony through an intermediary or agent, but the agent would have to incite or procure the other person to commit the crime. Here, Presley never incited McCoy to possess cocaine. There was never any effort by Presley, on behalf of the defendant, to cause McCoy to possess cocaine. To constitute the offense, there must be an act of incitement, procurement, or solicitation. Here, there was never an act of solicitation of McCoy to possess cocaine by either the defendant or Presley acting for the defendant.
Supplemental Assignment of Error: Issue No. 4
"Was it error for the State to allege by a bill of information that appellant "incited and procured a felony" and for the trial court to instruct the jury to convict appellant if they found that appellant either "incited or procured a felony?"
This assignment of error is controlled by LSA-C.Cr.P. Art. 480, which provides:
"If an offense may be committed by doing one or more of several acts, or by one or more of several means, or with one or more of several intents, or with one or more of several results, two or more of such acts, means, intents, or results may be charged conjunctively in a single count of an indictment, or set forth conjunctively in a bill of particulars, and proof of any one of the acts, means, intents, or results so charged or set forth will support a conviction."
This rule also applies to conjunctive charging in a single count of a bill of information. LSA-C.Cr.P. Art. 461. LSA-R.S. 14:28 makes it a crime for one person to endeavor to "incite or procure" another to commit a felony. It was therefore permissible, pursuant to LSA-C.Cr.P. Art. 480, for the State to charge the acts in the bill of information conjunctively, as was done. It was also proper for the trial court to instruct the jury that it could convict the defendant if it found that defendant either incited or procured a felony. See for example, State v. Redden, 255 La. 291, 230 So.2d 817 (La.1970); State v. Nix, 327 So.2d 301 (La.1976), cert. denied 425 U.S. 954, 96 S.Ct. 1732, 48 L.Ed.2d 198 (1976). This assignment of error lacks merit.
Supplemental Assignment of Error: Issue No. 5
"Did the trial court err in submitting the charge of corrupt influencing of James Norris to the jury where there was no evidence that appellant gave anything of value to anyone with the intention that the recipient would corruptly influence the conduct of James Norris in relation to his position, employment or duty?"
By this assignment of error, defendant argues that there was insufficient evidence to find him guilty on the charge of corrupt influencing of DA Norris. Defendant's argument is that the State at best only proved that the defendant's intent was to *363 frame or set up DA Norris and not that his intent was to have Presley corruptly influence DA Norris' conduct in relation to Norris' position, employment or duties, as required by LSA-R.S. 14:120.
Again, as under Issue 3, supra, the question is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime beyond a reasonable doubt. Jackson, supra; Nealy, supra.
LSA-R.S. 14:120 provides:
"Corrupt influencing is the giving or offering to give anything of apparent present or prospective value to, or the accepting or offering to accept anything of apparent present or prospective value by, any person, with the intention that the recipient shall corruptly influence the conduct of any of the persons named in R.S. 14:118 (public bribery) in relation to such person's position, employment or duty.
Whoever commits the crime of corrupt influencing shall be imprisoned for not more than five years with or without hard labor or shall be fined not more than five thousand dollars or both."
In this case, the State's theory, with which the jury obviously agreed, was that the defendant offered to give $7000 (and gave some of that money) to Bernard Presley with the intention that Presley would corruptly influence the conduct of DA Norris in relation to Norris' position, employment or duty as district attorney. The question raised by this assignment of error is whether there was sufficient evidence to prove the defendant's requisite intent, as outlined in LSA-R.S. 14:120.
A rational jury should have had a reasonable doubt that the defendant had the intent to have Presley "corruptly influence" DA Norris' conduct "in relation to Norris' position, employment or duties as district attorney." The testimony of every witness who touched upon this point was to the effect that the defendant's ultimate intention was to expose DA Norris as a drug user and thereby force him out of office. Once Norris was out of office, J.B. Harrison, the man with the money behind the defendant's scheme, would stand a better chance of receiving a pardon, as DA Norris was certain to oppose the granting of a pardon to Harrison. Bernard Presley testified that the defendant wanted to entrap DA Norris (R. p. 436) by planting narcotics on him (R. p. 460), and thereby get Norris out of office. (R. p. 381.) Deputy Medaries testified that defendant said his plan was to get Norris in a situation where drugs could be found on or around him and thereby compromise the district attorney. (R. p. 557). Norris testified that defendant said his plan was to discredit Norris and get him out of office. (R. p. 491). From this testimony, it seems the State did not prove that the defendant's intention was to have Presley corruptly influence Norris' conduct in relation to his position, employment or duty as district attorney. Rather, it appears that the State only proved the defendant's intent was to force Norris out of office. The evidence does not support a finding that Norris was expected to take any action or engage in any conduct related to his position, employment or duties as district attorney. There is no indication that the scheme was expected to result in Norris recommending a pardon for Harrison or taking any other action for the benefit of defendant or his associates. The direct testimony of Presley, Norris and Deputy Medaries was that the defendant's intent was simply to force Norris out of office. A rational jury should have had a reasonable doubt whether the requisite intent under LSA-R.S. 14:120 was sufficiently proven. The defendant's conviction of corrupt influencing on Count 4 must, therefore, be reversed.
Supplemental Assignment of Error: Issue No. 6
"Did the trial court err in submitting the charge of corrupt influencing of Kathy McCoy to the jury where the State's evidence failed to establish the controlling elements, or corpus delicti, of the crime?"
By this assignment of error, the defendant argues that the State failed to prove *364 an essential element of the crime of attempted corrupt influencing of Kathy McCoy. First, the defendant contends that the State did not prove that Ms. McCoy's position, employment or duties were connected with the prosecution or dismissal of Presley's shoplifting charge in the Monroe City Court system because, the defendant argues, an assistant district attorney has no authority over the autonomous court system of the City of Monroe. Additionally, the defendant argues that he could not have corrupted Ms. McCoy because she was already corrupt.
The defendant asks this court to take judicial notice that Ms. McCoy had no authority over the Monroe City Court system. This assertion, however, may not be true. It should be noted that there is no evidence of exactly what charge was pending against Bernard Presley in the Monroe City Court. The key to a determination of whether Ms. McCoy could dismiss a charge in a city court would turn on whether this was a State criminal charge or merely a violation of a municipal ordinance. Reference is made to the charge as one for shoplifting. This could have been a State criminal charge for low grade theft, a misdemeanor. The prosecution for a State offense, even though being held in a municipal court, must nonetheless be prosecuted by the district attorney or his designated assistants, not by a city prosecutor. City of Baton Rouge v. Malik, 404 So.2d 883 (La.1981); City of Baton Rouge v. Short, 345 So.2d 37 (La.1977). District attorneys have the discretionary power to dismiss any criminal case. LSA-C.Cr.P. Art. 691; State v. Norwood, 351 So.2d 122 (La.1977); City of Lake Charles v. Anderson, 248 La. 787, 182 So.2d 70 (1966). The term "district attorney" also includes an assistant district attorney. LSA-C.Cr.P. Art. 934(5). It therefore appears that assistant district attorney McCoy would have had authority to dismiss the "shoplifting" charge in the Monroe City Court, if it was a State criminal charge for low grade theft. The evidence does not establish that McCoy had no authority to dismiss the charge.
Even if the shoplifting charge alleged a violation of a Monroe city ordinance, and Ms. McCoy had no authority to dismiss it, it would not affect whether the defendant could be found guilty of attempt on the corrupt influencing count. The ability of Ms. McCoy to actually be able to have Presley's shoplifting charge dismissed is not at issue. In the case of State v. Williams, 213 La. 924, 35 So.2d 856 (1948), the Louisiana Supreme Court considered the corrupt influencing statute, LSA-R.S. 14:120, as it applied to a defendant who had received money with the intent to corruptly influence a public employee to improperly approve the issuance of a certificate of public necessity and convenience. Although the defendant in Williams was the offeree and the defendant in the instant case was the offeror, the discussion as to the ability of the public official to actually carry out the conduct requested is applicable:
"In this case it is not essential to the guilt of the accused that the state prove that such employee had the legal right to issue or refuse to issue a certificate of public necessity and convenience, for it is sufficient that his position, employment, or duties are connected with the issuance of such certificates, and that his conduct in relation to his position, employment, or duties is intended to be influenced corruptly by the recipient of the money." Williams at 858.
The Williams case was cited with approval in State v. Ponthier, 391 So.2d 1138, 1139 (La.1980), where it was stated, "The inability of the public employee to return value for the bribe is immaterial." Although the Ponthier case dealt with public bribery, LSA-R.S. 14:118, the reasoning is equally as applicable to the corrupt influencing statute. A comparison of the two statutes shows they are nearly identical, except that the public bribery statute requires that the public official be bribed for the purpose of influencing him, while the corrupt influencing statute requires that the purpose be to influence corruptly. See reporter's comments to LSA-R.S. 14:120.
*365 It is therefore apparent that whether Ms. McCoy could have actually obtained a dismissal of Presley's shoplifting charge is immaterial. As an assistant district attorney her duties were connected with prosecution of offenses and the evidence shows defendant's intent to corruptly influence her duties as a prosecutor by dismissing charges in return for cocaine.
It also matters not that the official whom defendant seeks to corruptly influence is already corrupt, although that is clearly not the case here.
This assignment of error has no merit.
Supplemental Assignment of Error: Issue No. 7 and 8
"7) Was the trial court's sentencing of appellant excessive?
8) Was the failure of the trial court to place appellant on probation error?"
The defendant was sentenced to one year at hard labor and a $1000 fine on each of the three counts of inciting a felony, to four and one-half years at hard labor and a fine of $5000 on the corrupt influencing count, and to 18 months at hard labor and a $2500 fine on the attempted corrupt influencing charge. All sentences were ordered to run concurrently. The maximum sentence under LSA-R.S. 14:28, inciting a felony, is two years at hard labor and/or a fine of up to $1000. The maximum sentence under LSA-R.S. 14:120, corrupt influencing, is five years at hard labor and/or a fine of up to $5000. Attempted corrupt influencing therefore carries a maximum penalty of two and one-half years at hard labor and/or a fine of up to $2500, LSA-R.S. 14:27 and 14:120. By these assignments of error, the defendant contends that the prison sentence imposed upon him is excessive and the trial court should have placed the defendant on probation.
Since defendant's convictions of corrupt influencing and inciting McCoy to commit a felony will be reversed, he now faces concurrent sentences totalling 18 months and a fine of $4500. The sentences imposed are not excessive.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in LSA-C.Cr.P. Art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983). The articulation of the factual basis for a sentence is the goal of LSA-C.Cr.P. Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with LSA-C.Cr.P. Art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La. 1981); State v. Hudgins, 519 So.2d 400 (La.App. 2d Cir.1988), writ denied 521 So.2d 1143 (La.1988).
The statutory criteria set forth in LSA-C.Cr.P. Art. 894.1 are appropriate both to measure whether a sentence is excessive because of its length or because it specifies confinement rather than less onerous sentencing alternatives, such as probation. State v. Sepulvado, 367 So.2d 762 (La.1979); State v. Cruz, 430 So.2d 161 (La.App. 2d Cir.1983). In this case, it appears the trial court adequately considered the sentencing guidelines of LSA-C.Cr.P. Art. 894.1 for the purposes of both determining the length of the sentence and denying probation.
The trial court adequately considered the defendant's personal history. The court noted the defendant's age, 45, and noted that defendant has been married three times and is the father of three children. The defendant was noted to be a good provider for his family and has apparently evidenced great concern for his children. Additionally, the trial court noted that the defendant has been the victim of unspecified health problems.
*366 The trial court also considered defendant's criminal history. Although the defendant had no prior felony convictions, the trial court noted that the defendant had a 1972 arrest in Houston for vice activities; the disposition of that arrest was unknown. The defendant was arrested in 1975 in Houston for interstate transportation of stolen property; that charge was dismissed. In 1977, again in Houston, the defendant was arrested for gaming, which resulted in a municipal court bond being forfeited. In 1980, due to his involvement in gaming activities in Austin, Texas, the defendant was arrested for failure to file tax returns and failure to pay a special tax. The defendant was convicted for failure to pay a special tax and was fined $10,000 and placed on one year supervised probation.
The trial court also noted that the defendant, although having no known connections to organized crime, has been involved since the early 1970's in gambling and bookmaking. The court also noted that the defendant, when faced with criminal charges in the past, has gained leniency or dismissal of the charges, by cooperating with law enforcement agencies. The trial court also noted that the pre-sentence investigation showed that the defendant came to Monroe and began gambling and bookmaking activities after assuring officials, following his 1980 conviction in Austin, that he would not involve himself again in bookmaking.
The trial court also noted that two mitigating factors existed. First, the trial court noted that the victim induced or facilitated the commission of the crime. Secondly, the court found that the defendant's conduct was a result of circumstances which were unlikely to recur.
Additionally, the trial court filed into the record a form entitled "Statement of Considerations as to Sentence of Imprisonment" which lists the LSA-C.Cr.P. Art. 894.1(B) factors, with a space to mark if the mitigating factor was present or not. Where a trial court uses such a form and articulates some of the reasons contemplated by the statute for the sentence, the guidelines of LSA-C.Cr.P. Art. 894.1 have been substantially met. State v. Fergus, 418 So.2d 594 (La.1982), cert. denied 459 U.S. 1106, 103 S.Ct. 730, 74 L.Ed.2d 954 (1983); State v. Lemons, 430 So.2d 150 (La.App. 2d Cir.1983), writ denied 433 So.2d 1056 (La.1983). Based on the form filed by the trial court as well as the articulated reasons for sentence outlined above the trial court adequately complied with LSA-C.Cr.P. Art. 894.1.
Our review must also determine whether the sentence imposed is too severe given the circumstances of the case and the background of the defendant. A sentence violates LSA-Const. Art. 1, § 20 (1974) if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it is so disproportionate as to shock the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985). The trial judge has wide discretion in the imposition of a sentence within the statutory limits and such a sentence should not be set aside as excessive absent a manifest abuse of discretion. State v. Square, 433 So.2d 104 (La.1983); State v. Hudgins, supra.
The trial court did not abuse its discretion in imposing sentence on the defendant. The trial court noted that the defendant's conduct could have caused or threatened serious harm and that the defendant had to be aware of that fact. The trial court noted that had the defendant's plan succeeded, the reputation of DA Norris and assistant district attorney McCoy might have been destroyed. Additionally, the trial court noted that there was a possibility that law enforcement in general may have been corruptly influenced. The trial court was therefore of the opinion that any lesser sentence would deprecate the seriousness of the offense. The trial court was obviously of the opinion that the defendant was in need of correctional treatment. This is apparent from the trial court's mentioning that defendant's gambling and *367 bookmaking had not ceased even after his previous run-ins with law enforcement authorities in Texas. Under the facts shown in this case, it does not appear that the sentences imposed constitute a purposeless and needless infliction of pain and suffering. The trial court did not abuse its discretion in imposing sentence in this case.
Decree
For the reasons assigned, the defendant's convictions and sentences on Count 3, inciting a felony, and Count 4, corrupt influencing, are reversed and set aside. The defendant's other convictions and sentences are affirmed.
Two convictions reversed; three convictions affirmed.

ON APPLICATION FOR REHEARING
HALL, MARVIN, SEXTON, FRED W. JONES and LINDSAY, JJ.
Rehearing Denied.