571 So.2d 749 (1990)
STATE of Louisiana, Appellee,
v.
Robert Earl BISHOP, Appellant.
No. 21944-KA.
Court of Appeal of Louisiana, Second Circuit.
December 5, 1990.
*751 Crawford A. Rose, Jr., Rayville, for appellant.
William J. Guste, Jr., Atty. Gen., New Orleans, William R. Coenen, Jr., Dist. Atty., and Penny Wise-Douciere, Asst. Dist. Atty., Rayville, for appellee.
Before SEXTON, NORRIS and HIGHTOWER, JJ.
NORRIS, Judge.
The defendant, Robert Earl Bishop, was charged by bill of information with armed robbery, La.R.S. 14:64. His first trial ended in mistrial; after his second jury trial he was found guilty as charged. The court sentenced him to 60 years at hard labor without benefit of parole, probation or suspension of sentence. Bishop now appeals, advancing a total of four assignments of error, one of which has been abandoned. URCA-Rule 2-12.4; State v. Williams, 338 So.2d 672 (La.1976). For the reasons expressed, we affirm.

Facts
The following facts are summarized from the second trial, viewed in light most favorable to the state. On the night of January 6, 1988, Bishop and two confederates, Tyrone Williams and Freddie Gibbs, drove to Shoemaker's Fast Stop on Highway 80 in Rayville. Gibbs, the driver, parked behind the store and let out Bishop and Williams. They were wearing ski masks, hoods and dark clothing. After they entered the store, each walked to a cashier and brandished a pistol; Bishop ordered them at gunpoint to take a bag, put the money in, and make it quick. The cashiers complied. One of them, Ms. Kelly, testified that though she could not see their faces, she took close note of the clothes the assailants were wearing and the guns they were wielding. When the bags were filled the assailants grabbed them, ordered the cashiers into the rear of the store, and bolted out the door. Gibbs was waiting for them nearby. They drove to the vicinity of the public swimming pool, where Williams pitched part of his disguise. They then drove to Bishop's mother's house. Bishop did not actually enter the house but ran to a shed in the back yard. He returned to the car moments later but with different clothes on. They then drove to Richland Apartments to see Williams's girlfriend. There they dumped the money on a table and hastily divided it. Williams and Gibbs put their shares together and hid it in a closet in the apartment; Bishop kept his. They then left and drove Bishop to the trailer where he and his girlfriend lived on Texas St. After dropping Bishop off, Gibbs and Williams went downtown to go drinking.
Within minutes of the robbery, Rayville Police and Richland Parish Sheriff deputies arrived at the Fast Stop to investigate. Deputy Robinson had a hunch that Williams and Gibbs might be involved because deputies in adjacent Ouachita Parish had told him earlier that these two were plotting an armed robbery in Ouachita Parish. Dep. Robinson went down to Russell Street and started asking for Williams and Gibbs. Sometime later, they approached Dep. Robinson and followed him to the sheriff's office for questioning. Meanwhile, an anonymous caller, later identified as Lavelle Wilson, telephoned the sheriff's office to tell Dep. Robinson that he had witnessed the robbery. He later testified that he had been standing near the railroad tracks, observed the incident and recognized Gibbs's car. Wilson later received $50 from Crimestoppers for this information.
In the course of questioning, Gibbs eventually consented to let Dep. Robinson search his car. This search turned up a loaded pistol and a ski mask, both of which matched those described by Ms. Kelly. Gibbs then led Sgt. Graham to Richland *752 Apartments; in Williams's girlfriend's apartment they uncovered $254 in cash. Around this time, city police recovered the other ski mask near the swimming pool. The next day Williams and Gibbs consented to give taped confessions.
That afternoon, Dep. McDonald went to Bishop's mother's house and, pursuant to her consent to search, found in the shed a pistol and clothes that fit Ms. Kelly's description. Already in custody, Bishop telephoned his mother and she pleaded with him to return the money the officers were looking for. After the phone call, Bishop's mother led Dep. McDonald to the trailer, where $332 in cash was wrapped and stashed in a dresser drawer.
For his role in the crime Williams pled guilty to armed robbery and was sentenced to the maximum, 99 years at hard labor without benefit.[1] Gibbs pled guilty to accessory after the fact of armed robbery; he was sentenced to the maximum, five years (he did not say whether hard labor was imposed). They were neither promised nor favored with any leniency for testifying against Bishop.
Bishop's first trial was in early December 1988. It ended in mistrial, however, when Dep. Robinson identified Wilson as his reliable confidential informant; the trial judge concluded that the state had unintentionally misled the defense about the identity and availability of a material witness.
The second trial was in April 1989. At this trial Williams testified that Bishop instigated the robbery on January 5 by asking him, "Do you want to make some money?" When Bishop explained that he had a gun and just needed a ride, Williams understood that he intended a robbery. Williams then solicited Gibbs, who had a car and a gun. Gibbs also testified for the state, corroborating Williams's account of the robbery and the tortuous path the robbers took afterward. Lavelle Wilson, the eyewitness, testified that he knew Gibbs and recognized his burgundy 1976 Olds Cutlass. From his vantage point near the tracks, Wilson saw Bishop and Williams get out of the car, don masks and enter the store; he saw they were holding something in their hands; he saw the cashier putting something in a bag; he saw Bishop and Williams run out, hop into Gibbs's car and drive down Rosa Street. Deputies Robinson and McDonald testified about the investigation; the cashiers at the Fast Stop verified that the masks and guns taken as evidence matched those used by the robbers, and that Bishop's build was similar to that of one of the robbers.
The defense urged an alibi; Bishop testified that he was at his girlfriend's trailer on the evening of the robbery, except for two quick errands to get some cigarettes. The girlfriend and her 10-year old daughter also testified in an effort to support the alibi. Bishop further explained that the $332 cash in the dresser drawer was money he had saved from his unemployment checks. The defense attacked Williams and Gibbs as felons and not worthy of belief. Even more strongly it attacked Lavelle Wilson. It produced a witness, Glen Miller, who was standing with Wilson near the tracks when, according to Wilson, the robbery occurred; Miller did not see a robbery, but he left the scene sooner than Wilson did. The defense also argued that Wilson was a "paid witness" who actually retracted his statement two months after the crime in a meeting at the defense counsel's office. Wilson admitted that this meeting took place between himself, Bishop's lawyer and Mr. Riser, the editor of the Richland Journal; nobody from the D.A.'s office was present.[2] He also admitted that when it was suggested to him, "You weren't there" and "Robinson is lying," he agreed. At trial, however, Wilson explained that he went along with Bishop's lawyer that day only because Bishop was threatening his (Wilson's) mother. Mr. Riser testified that Wilson was "very nervous" at the meeting and he was not sure about Wilson's alleged retraction. Gibbs testified *753 that while they were in jail together, Bishop had threatened to have him killed if he testified against Bishop. Bishop denied that he ever threatened anybody.
As noted, the jury found Bishop guilty as charged.

Discussion
Bishop's first original assignment of error, urging insufficiency of evidence, was neither briefed nor argued and is considered abandoned. Despite the defense's efforts to discredit Williams, Gibbs and Wilson, their testimony was consistent and reasonable enough that the jury could choose to accept it. The circumstantial evidenceguns, masks and money discarded or hidden along the robbers' pathwas totally corroborative. The totality of the evidence, viewed in light most favorable to the state, was easily sufficient to persuade a rational finder of fact that every element of the offense was proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
By his second original assignment of error Bishop urges the conviction should fall because of the "use of rehearsed witnesses and use of perjured witnesses." In brief he mentions misconduct on the part of the state "in that it did present as a creditable witness Lavelle Wilson and did have one witness testify differently from her testimony at the first trial." He cites absolutely no authority. The unnamed witness is apparently Ms. Kelly, one of the cashiers at Shoemaker's Fast Stop.
We note at the outset that Bishop originally urged prosecutorial misconduct by motion to dismiss the prosecution. However, he voluntarily withdrew this motion before the second trial, with prejudice, and with a stipulation that neither the D.A. nor his assistant on the case had engaged in intentional misconduct. Bishop did not argue misconduct at trial; he did not request a special jury charge; and he did not object to these witnesses' testimony. Without contemporaneous objection, the argument is waived. La.C.Cr.P. art. 841. It cannot be advanced for the first time on appeal. State v. Skipper, 387 So.2d 592 (La.1980); State v. Richard, 550 So.2d 300 (La.App. 2d Cir.1989). Moreover, prosecutorial or governmental misconduct must be proved by the defendant and is available only in the rarest and most egregious circumstances; such proof is absent from the instant record. State v. Kotwitz, 549 So.2d 351 (La.App. 2d Cir.1989), and citations therein.
Insofar as he challenges Ms. Kelly's and Lavelle Wilson's credibility, Bishop offers little guidance in brief. Ms. Kelly admitted that she had "gone over" her testimony with the D.A., Mr. Coenen, a few days before trial. She denied that he told her how to present her answers. R.pp. 470-71. Counsel tried to impeach her with allegedly inconsistent testimony from the first trial. When the state objected to lack of foundation, the defense did not pursue the issue and we see no basis for impeachment. La.C.Evid. art. 613. We have also reviewed her testimony at both trials and discern no significant difference. We see no reason why the jury could not accept her testimony.
As for Wilson's testimony, the defense brief once again fails to specify what was rehearsed or perjured. However, we have reviewed his testimony and conclude that any problems in it would not compel a rational jury to reject it. For instance, Wilson was a "paid" witness, but only to the extent that Crimestoppers paid him $50 for his tip. There were some differences between his testimony at the first trial and the second, like whether he had been an informant for Dep. Robinson on previous occasions, and whether he went to his girlfriend's house before or after he observed the robbery. The defense made the most out of the meeting between Wilson, Bishop's attorney and perhaps Bishop, where Wilson allegedly agreed with their loaded suggestions. Wilson explained that he agreed only to get Bishop off his mother's back, and there was evidence that Bishop threatened other witnesses as well. These "problems" could conceivably have affected Wilson's credibility. However, he offered reasonable explanations for each inconsistency *754 and other witnesses corroborated him. The jury has broad discretion to believe or discredit a witness. State v. Trosclair, 443 So.2d 1098 (La.1983). When the finder of fact has made a rational credibility call, the appellate court should not disturb it. State v. Mussall, 523 So.2d 1305 (La.1988); State v. Holland, 544 So.2d 461 (La.App. 2d Cir.1989). On this record the jury was certainly entitled to believe Wilson. We would also note that even if the jury had chosen to reject Wilson's testimony, the direct, eyewitness accounts of Williams and Gibbs would be sufficient to convict.
This assignment does not present reversible error.
By his first supplemental assignment of error Bishop urges the sentence is excessive. The test of excessiveness is two tiered. First the record must show that the trial court took cognizance of the sentencing guidelines of La.C.Cr.P. art. 894.1. State v. Sepulvado, 367 So.2d 762 (La. 1979). Bishop does not contend (and he could not on this record) that the trial court failed to follow the guidelines. The trial judge stated a thorough factual background on the record; he ordered and reviewed a presentence investigation report ("PSI"); and he carefully discussed both the general guidelines of art. 894.1A and the "important elements" under State v. Jones, 398 So.2d 1049 (La.1981) and State v. Hudgins, 519 So.2d 400 (La.App. 2d Cir.), writ denied 521 So.2d 1143 (1988). The court did not recite the litany of aggravating and mitigating factors of art. 894.1B but it specially noted the seriousness of the offense, the threat of harm to the victims, Bishop's poor criminal record and the fact that probation is not an option for armed robbery. In mitigation the court noted that Bishop was helping teach Bible study in parish jail. The court adequately complied with the guidelines.
The second tier is constitutional excessiveness. A sentence violates La. Const. art. 1 § 20 if it is grossly out of proportion to the severity of the offense or nothing more than needless and purposeless imposition of pain and suffering. State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, the sentence shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985). The trial court has wide discretion in imposing a sentence within statutory bounds. State v. Lanclos, 419 So.2d 475 (La.1982). In passing sentence the court may rely on all criminal activity, not just convictions. State v. Washington, 414 So.2d 313 (La. 1982). The statutory bounds for armed robbery are a minimum of five and a maximum of 99 years at hard labor, all without benefit of parole, probation or suspension of sentence.
Bishop's prior record included a 1968 arrest for burglary with the charge dismissed; 1972 arrests in Texas for felony theft and shoplifting, with no disposition shown; a 1977 conviction for possession of marijuana, resulting in six months' probation; a 1980 conviction for DWI-second offense, resulting in a fine; a 1981 arrest for driving under suspension; a 1982 arrest for disturbing the peace; and a 1985 conviction for distributing marijuana, resulting in two years at hard labor. The state could have charged Bishop as a second felony offender, thus exposing him to a minimum of 49-½ years under La.R.S. 15:529.1, but it elected not to do so. Evidence adduced at trial tended to show that Bishop browbeat or threatened not only witnesses who might testify against him, but one witness's mother. Finally, Bishop was not a passive player in this crime; he hatched the plot and took charge of the stick-up. Under the circumstances this upper-range sentence does not shock our sense of justice. This assignment lacks merit.
By his final assignment Bishop urges "the use of hearsay evidence contained in the PSI as being a violation of his right to confront witnesses against him." Because his brief cites no authority at all we would simply point out that confrontation is a trial right. U.S. Const. amend. 6; La.Const. art. 1 § 16. For purposes of sentencing the court may draw from sources beyond mere convictions; hearsay *755 evidence is permitted. State v. Higginbotham, 541 So.2d 348 (La.App. 2d Cir.1989), amended and aff'd on other grounds 556 So.2d 28 (1990). Moreover, Bishop has not alleged what (if any) information in the PSI is incorrect or how it prejudiced him. See State v. Waller, 519 So.2d 301 (La.App. 2d Cir.1988). We perceive no error.
We have finally reviewed the record for errors patent and find none. La.C.Cr.P. art. 920(2). The conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] The guilty plea was vacated on other grounds and the matter is pending. State v. Williams, 554 So.2d 139 (La.App. 2d Cir.1989).
[2] The D.A., Mr. Coenen, nevertheless thought that Bishop was also present at the meeting. R.P. 672.