726 So.2d 1061 (1999)
STATE of Louisiana, Appellee,
v.
Brandon McKinley JACKSON, Appellant.
No. 31,433-KA.
Court of Appeal of Louisiana, Second Circuit.
January 20, 1999.
*1065 Keele & Associates by Daniel R. Keele, Shreveport, Counsel for Appellant.
Richard Ieyoub, Attorney General, James M. Bullers, District Attorney, Whitley Graves, Assistant District Attorney, Counsel for Appellee.
Before STEWART and GASKINS, JJ., and HIGHTOWER, J. Ad Hoc.
GASKINS, J.
Following a jury trial, the defendant, Brandon McKinley Jackson, was convicted as charged of the offense of armed robbery, La. R.S. 14:64. The trial court subsequently found the defendant to be a habitual offender, fourth offense, and sentenced him to serve life imprisonment without benefit of parole, probation or suspension of sentence. The defendant appealed. For the reasons set forth below, the defendant's conviction and sentence are affirmed.

FACTS
The defendant was charged with the armed robbery of Tim Day, the manager of Applebee's restaurant in Bossier City, on July 17, 1996. At about 2:15 a.m., Mr. Day and two other employees, Joseph Lee Graham and Joseph Young, were busy closing the restaurant for the night. As Joseph Young opened the restaurant's back door to take out the trash, two masked black males armed with handguns pushed him back inside the restaurant.
Young and the masked men went into Day's office. Day said that the only masked man he saw clearly was armed with a blue steel revolver and wore a blue bandana as a mask; he did not hear this person say anything. The second masked man threatened to shoot Day unless he cooperated. One of the robbers left the office with Young and shortly thereafter returned without Young. The robber wearing the ski mask ordered Day to the floor and directed the other robber to tape Day's hands. The men then took a substantial amount of cash belonging to the restaurant from Day's desk drawers. In all, the robbers took approximately $6,500 in cash and $2,000 in gift certificates. The robbers also took Day's wallet before they left.
One of the robbers had taken Young from the office into the bar area where they encountered Graham. Young told Graham that they were being robbed. Graham thought that Young was kidding until the masked man put a "silver ... rusty" revolver to his head. Graham said that this man was wearing a ski-mask and a pair of ill-fitting surgical gloves. Young tied Graham's hands behind his back with duct tape. Then the robber tied Young's hands with duct tape.
Once the robbers were gone, Day managed to free himself from the tape. He then set off the silent alarm and discovered Young and Graham bound on the floor in the kitchen. Day freed them, and they awaited the arrival of the police.
Police were unable to take fingerprints from the tape which bound the employees. Neither Day nor Graham could identify the masked men, but Day described both men as physically smaller than himself. Police also learned that Day had information, several weeks old, from another Applebee's employee, Amos Givan, Jr., that a group of persons had been planning to rob the Bossier City restaurant one morning before it opened. Day said that the employees had taken additional security precautions due to this information but had not notified the police.
That information was more fully developed during the subsequent investigation. Ken Fuller, who also worked at Applebee's in Bossier, testified that about three weeks before the robbery, he was at the defendant's home along with the defendant, the defendant's brother Trandy Wade, Joseph Young and another person nicknamed Junior. Fuller *1066 said that the men asked Junior to leave the room and then planned the Bossier City robbery. He testified that the others asked him to participate in the robberyby opening the restaurant's back doorbut he refused. A few days later, Fuller told his friend Amos Givan, Jr. what he had heard. Givan testified that he gave the information to the general manager and the kitchen manager of Applebee's.
Later on the morning of the robbery, between 6:30 a.m. and 7:00 a.m., Bossier City Police Department Detective Kenny Hamm was at the restaurant speaking with Givan when a car pulled up in the parking lot. At that time of the morning, the restaurant was closed. Givan pointed to the car and said "That's them." Inside the car were the defendant and his girlfriend, Pearlie Ann Vales. The defendant and Vales asked another Applebee's employee whether Ken Fuller was there; learning that he was not present, they left. The detective later spoke to Fuller who gave him the names of Jackson, Wade and Young. The detective learned that Wade was training at Fort Polk at the time of the robbery and eliminated him as a suspect.
Several days later, Detective Hamm went to the residence of the defendant's parents. There, he was surprised to find Young and asked him to come to the police station for an interview. During the interview, Young contradicted his initial story that he was a victim and admitted to the detective that he had been involved in the robbery. Young named the defendant as one of the masked men but said that he did not know the identity of the other masked man.
On July 25, the detective accompanied Young to his residence where he gave the detective two loaded revolversone chromeplated, the other blue steel. According to Young, these were the guns used in the robbery. Young told the detective that the defendant gave him the guns and instructed him to get rid of them. Because the guns had been handled extensively and wrapped in cloth, police did not try to find fingerprints on the weapons. Young also arranged for the detective to collect the $560 remaining from Young's share of the robbery proceeds.
Young and the defendant were both charged with armed robbery. In exchange for an agreement to reduce the charge against him to conspiracy to commit armed robbery, Young agreed to testify against the defendant. At the time of trial, Young had not yet been sentenced.
Young testified that he, the defendant, Wade and Fuller had discussed the robbery; he said that this discussion took place at the home of the defendant's parents. Young said that he agreed to participate in the robbery by opening the back door of the restaurant to allow the others inside and that the other robbers tied him up to make him look like a victim. Young testified that he recognized the defendant as the man wearing the ski mask but did not know the identity of the second man wearing the bandana. He testified that the defendant gave him $1,000 for his part in the crime and also gave him the two guns with instructions to dispose of them. Young admitted that he had lied to police and other persons about his involvement in the robbery and about the other participants in the crime; he also admitted that he had lied about events even after he confessed to Detective Hamm. On cross-examination, Young further admitted to lying to the defendant's family by downplaying the defendant's role in the crime. He also said that he had lied to defense counsel about the description of the robbers. Young testified that the defendant was wearing a black ski mask with cutouts for the eyes and nose and the other robber wore a red bandana over his face.
The defendant did not testify. Based upon all of this evidence, the jury convicted the defendant, as charged, of armed robbery. The defendant was sentenced as a habitual offender to life imprisonment without benefit of parole, probation or suspension of sentence. He now appeals, making 19 assignments of error. However, one assignment was not briefed and is deemed abandoned. URCA Rule 2-12.4; State v. Schwartz, 354 So.2d 1332 (La.1978); State v. Kotwitz, 549 So.2d 351 (La.App. 2d Cir.1989), writs denied, 558 So.2d 1123 (La.1990).

*1067 SUFFICIENCY OF EVIDENCE
In brief, the defendant argues that the evidence was insufficient to prove the elements of armed robberyspecifically, his identity as one of the robbersbeyond a reasonable doubt. The issue of the sufficiency of the evidence to convict is properly raised by a motion for post-verdict judgment of acquittal under La.C.Cr.P. art. 821. No such motion appears in this record. However, in State v. Green, 28,994 (La.App.2d Cir.2/26/97), 691 So.2d 1273, this court ruled that it must consider sufficiency complaints raised as assignments of error even in the absence of such a motion. Accordingly, we consider the issue.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proved beyond a reasonable doubt. If an appellate court reviewing a criminal conviction finds the evidence insufficient to support a guilty verdict, the constitutional protection against double jeopardy bars retrial of the defendant. Hudson v. Louisiana, supra; U.S. Const. Amend. V, XIV. All other issues in the case become moot. State v. George, 95-0110 (La.10/16/95), 661 So.2d 975; State v. Hearold, 603 So.2d 731 (La.1992).
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, 29,253 (La.App.2d Cir 4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333; State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (La.1987).
The defendant contests the state's proof that he was the perpetrator of this crime. When the defendant claims that he is not the person who committed the crime, the Jackson rationale requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Powell, 27,959 (La.App.2d Cir.4/12/96), 677 So.2d 1008, writ denied, 96-1807 (La.2/21/97), 688 So.2d 520.
In State v. Dunn, 30,560, p. 8 (La.App.2d Cir.2/25/98), 709 So.2d 852, 857, this court stated:
As a general principle of Louisiana law, a conviction can be sustained on the uncorroborated testimony of a purported accomplice. However, when the state's case relies upon the uncorroborated testimony of a purported accomplice, the trial judge (or jury) should treat such testimony with great caution. This great caution is not required if there is evidence that confirms material points in an accomplice's tale, and confirms the defendant's identity and some relationship to the situation. State v. May, 339 So.2d 764 (La.1976); United States v. Lee, 165 U.S.App. D.C. 50, 59, 506 F.2d 111 (D.C.Cir.1974); United States v. Clark, 480 F.2d 1249 (5th Cir.1973); [Davis v. United States,] 411 F.2d 1126 (5th Cir. 1969); United States v. Cianchetti, 315 F.2d 584 (2d Cir.1963).
As observed by the court in United States v. Lee, supra, "when there is no corroboration, the problem of perjury looms large and warrants a judicial exposition of the frailties of accomplice testimony." State v. Murray, 375 So.2d 80, 88 (La.1979). Uncorroborated testimony presents the danger that an innocent person might be convicted solely on the perjurious fabrication of an accomplice. Id. at 89.
Because masks obscured the robbers' faces and prevented the victims from making any identification, the only person present during the robbery who was able to identify the defendant as one of the robbers was Joseph *1068 Young. Young, the robbers' accomplice, admitted that he had lied repeatedly about these events in order to exculpate himself. Further, police were unable to connect the defendant to the crime using fingerprints or scientific tests.
The chief element of proof corroborating Young's story is the testimony of Ken Fuller. Although in brief the defendant characterizes Fuller's testimony about the plan for the robbery as only a "discussion" following a movie, Fuller directly contradicted that characterization at trial; he said that the men, including the defendant, were actually planning to rob the restaurant. Indeed, Fuller was so concerned about what he had heard that, before the robbery, he notified his friend and co-worker, Amos Givan, Jr., of the plan. This witness also described what the men wanted him to doopen the restaurant's back doora job which he refused but which Young claims to have accepted.
Further linking the defendant to the offense is his presence at the scene of the crime only hours after the robbery in the early morning when the restaurant was closed.
There are other elements of the evidence which do not necessarily connect the defendant to the crime but which tend to corroborate Young's story. Most important among these elements are the firearms which Young gave the police. The chrome-plated and blue steel revolvers generally matched the descriptions of the weapons given by Day and Graham. Another such element is Young's surrender to police of what remained of the proceeds he obtained from the robbery.
Young admitted to the jury that he had lied to numerous persons about his and the defendant's involvement in the crime, and the defendant exposed the details of those lies during cross-examination. Unlike Dunn, there was no evidence in this case of any particular animosity between the witness and the defendant. More importantly, Young's testimony presented few if any contradictions with the testimony of other witnesses. He described one robber's bandana as red while Day said it was blue; however, apart from that discrepancy, his version of events tracked the testimony given by Day and Graham. The jury was made fully aware of the witness' deal with the state and the advantage he obtained by testifying. In short, there are not sufficient cautionary elements present in this case for this court to overturn the jury's decision to credit Young's testimony. Because that testimony identified the defendant as one of the masked armed robbers, the evidence is sufficient to sustain the conviction.
This assignment of error is without merit.

TESTIMONY OF DETECTIVE HAMM
The defendant makes four assignments of error pertaining to the testimony of Detective Kenny Hamm. They raise the issues of hearsay, relevancy, restrictions on cross-examination, and the scope of redirect.

Hearsay
On direct examination, the prosecutor elicited evidence from Detective Hamm about the progress of the investigation and specifically about the seizure of the handguns. The following exchange then occurred:
Q: Well, why did you seize these?
A: Mr. Young told me that they were the guns that were used in the robbery. He told me that those were guns that Mr. Jackson gave to him to get rid of. Instead of doing what Mr. Jackson originally told him to do which was....
At that point, the defendant objected to the testimony as hearsay. After argument, the court ruled that the officer could repeat what Young told him about what the defendant said because the evidence was an admission against penal interest by both parties.
The prosecutor continued:
Q: Now, then, what was the statement that Mr. Young told you about the firearms and what he was supposed to do with them?
A: He was supposed to get rid of them by throwing them away and he said he didn't throw them away, he went and put them in his house.
On appeal, the defendant complains that this evidence was hearsay.
La. C.E. art. 805 provides:

*1069 Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided by legislation.
The question of the admissibility of the detective's testimony has two components first, the defendant's statement to Young, and second, Young's statement to the detective relating the defendant's statement.
The defendant's statement to Young was admissible under La. C.E. art. 801, which provides, in pertinent part:
D. Statements which are not hearsay. A statement is not hearsay if:
(2) Personal, adoptive, and authorized admissions. The statement is offered against a party and is:
(a) His own statement, in either his individual or a representative capacity....
The evidence that the defendant told Young to dispose of the guns is the defendant's own statement, offered against him.
With regard to Young's statement to the detective, however, the law is different. Hearsay is a statement, other than one made by the declarant while testifying at the present trial, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C). The parties apparently focused on the admission of Young's statement to prove the truth of the matter asserted therein that the defendant instructed Young to get rid of the guns. Therefore, the evidence that Young told the detective what the defendant said to do with the guns depends upon the availability of the declarantYoungto testify.
La. C.E. art. 804 provides, in pertinent part:
B. Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.
The statement to the detective was against Young's penal interest; he was providing the police with the first piece of evidence tying him to the crime.[1] However, Young was available as a witness, and indeed testified at the trial. Because Young was not "unavailable," Young's statement to the detective was not admissible under the theory that the statement was against Young's penal interest. During the argument at trial, it was specifically noted that Young was available to testify. Accordingly, the court should not have allowed the detective to testify about what Young told him to prove the truth of the matter asserted.
Notwithstanding the erroneous admission of evidence, a verdict will not be reversed if the reviewing court, assuming that the damaging potential of the improperly admitted evidence is fully realized, determines that the error was harmless beyond a reasonable doubt. Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); State v. Wille, 559 So.2d 1321, 1332 (La.1990), cert. denied, 506 U.S. 880, 113 S.Ct. 231, 121 L.Ed.2d 167 (1992). "Reversal is mandated only when there is a reasonable possibility that the evidence might have contributed to the verdict." Wille, supra, at 1332 [citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)]. Factors to be considered include the importance of the evidence to the state's case, the presence or absence of additional corroboration of the evidence, and *1070 the overall strength of the state's case. Wille, at 1332.
The admission of the detective's testimony was harmless beyond a reasonable doubt because the jury heard Young himself relate the information. The error in introducing this cumulative evidence was further mitigated by the defendant's opportunity to cross-examine Young. See, e.g., State v. Coates, 27,287 (La.App.2d Cir.9/27/95), 661 So.2d 571, 581, writ denied, 95-2613 (La.2/28/96), 668 So.2d 365. In light of Young's admissible testimony about what the defendant told him, admission of the detective's testimony about what Young told him that the defendant said was harmless error the verdict was surely unattributable to the error.
This assignment of error is without merit.

Relevancy
After eliciting the details of the investigation from Detective Hamm, the prosecutor asked him:
Do you often criticize yourself, Detective Hamm, in the way that you handle an investigation or receive critique from other officers?
The defendant objected to that question, challenging its relevance, and the court overruled the objection. The detective went on to explain that "I find myself always criticizing myself and, in essence, said that if he were to do the investigation again, he would have tried to obtain fingerprints from the money that Young gave to him.
The defendant had the opportunity to cross-examine the witness about this statement. The detective said that he had 13 years experience as a police officer and four years of experience as a detective, and the defendant made the point that even after all that experience, the detective made a mistake by not attempting to take prints from the money.
On appeal, the defendant asserts that the prosecutor's question was calculated to bolster the detective's credibility and argues that such questioning was improper because the detective's credibility had not been attacked. See La. C.E. art. 607.
The prosecutor's question cannot be characterized as an attempt to bolster the witness' credibility. Rather, in context, the question was designed to explain the absence of a fingerprint analysis of the money surrendered by Young. The prosecutor and the detective knew that Young claimed that the defendant had given him the money. Rather than allow the absence of physical evidence connecting the defendant with the money to bolster the defendant's case, the prosecutor sought to explain why the absence of fingerprint evidence was not contrary to the state's theory of the case. The state's question was only an introduction to that explanation, and the prosecutor did not further explore the detective's opinion of his work.
The defendant presents no compelling argument that the court's ruling presented reversible error. This assignment of error is without merit.

Cross-examination
After the detective admitted that failing to take fingerprints from the cash was a mistake, defense counsel asked:
And those kinds of mistakes could end up putting people in jail, right?
The state objected to this question on the ground that it called for a subjective answer, and the court sustained the objection. However, the defendant was allowed to continue his cross-examination on this point, and the detective admitted that fingerprints on the money could have been an important point in the case.
The defendant makes a brief argument on appeal that the court should not have sustained the state's objection to his question. He does not, however, argue convincingly that the court's ruling was error or that any error would be reversible under La.C.Cr.P. art. 921. The defendant's question called upon the witness to speculate about the legal impact of an alleged omission in his investigationan issue for which there was no foundation laid and about which the detective could only give a conjectural answer. The court did not err in directing counsel to rephrase the question, and in no event was *1071 the ruling a prejudicial limitation on the defendant's right of confrontation.
This assignment of error is without merit.

Scope of redirect examination
Tim Day testified that as the men tied him up, he was able to see one robber's boots. On cross-examination, Detective Hamm testified that Mr. Day told him that "the only thing he got a good look at was a pair of shoes." Defense counsel then asked:
Q: Did you recover those shoes?
A: No, sir.
Q: Did you look for them?
A: Yes, sir.
On redirect examination, after learning that the defendant had been staying with his girlfriend, the prosecutor asked the detective whether he had obtained an address for the girlfriend's home. The detective said that he did have that address, but the defendant objected when the prosecutor asked the detective what he found when he went there. The defendant argued that the question was outside the scope of redirect and without foundation. The prosecutor countered by saying that the question was designed to explain the detective's inability to locate the shoes; apparently the address that the detective had was for a home which no longer existed due to the extension of I-49. The court overruled the objection, and the detective told the jury that I-49 had "wiped out that whole section of houses." On recrossexamination, the detective admitted that he later went to an area that was purported to be the girlfriend's address, that he had the address of the defendant's parents, and that he did not recall who gave him the bad address.
The defendant argues on appeal that the court erred by allowing the detective to testify that he found the I-49 address to be bogus. However, in light of the extended cross-examination allowed on this minor point, the error, if any, is harmless beyond a reasonable doubt. Evidence that the detective did not know where to look for the defendant's shoes tends to explain why the detective did not recover any shoes for identification. In the absence of a showing that the defendant tried to deceive the detective, the admission of evidence that the defendant's girlfriend's address was invalid does not present reversible error.
This assignment of error lacks merit.

TESTIMONY OF AMOS GIVAN, JR.
In three assignments of error, the defendant contends that the trial court erred in allowing the state to ask Amos Givan, Jr., about uncharged crimes, irrelevant incidents, and redirect questions outside the scope of cross-examination.
After Givan testified that he passed along to Applebee's management the robbery tip that he got from Ken Fuller, the defendant cross-examined the witness about when he passed on the tip and the substance of the tip. The defendant also asked Givan if he knew what vehicles were used in the robbery and whether he had informed police who was involved; Givan said that he did not see the robbery and did not remember telling police who was involved.
On redirect, the state asked:
Mr. Givan, between the time that you told Tim Day and the time that this robbery took place, was there another incident that took place when you were there that scared you and other people?
The defendant objected to this question on the grounds that it was outside the scope of cross-examination, that it might pertain to uncharged crimes and that the event was irrelevant to the robbery. The state responded by arguing that the defendant had "opened the door" for this questioning by asking the witness about his knowledge of what vehicles or persons were involved in the robbery. The prosecutor argued:
This is a direct relationship to an attempted armed robbery by the same defendant approximately a week prior.
The prosecutor then said that it was going to bring up this suspected armed robbery without implicating the defendant"to show that there were two incidences involved here where he did give the police information about cars and he did give the police information about who he suspected to be involved in it." The court allowed the prosecutor *1072 to ask questions about this earlier incident.
The witness did not recall much about the earlier incident; he said that an unknown person rang the restaurant's doorbell one morning before the business opened. The witness' answer to the state's question about the vehicles involved in the incident is reported in the transcript as inaudible. He did not remember whether he reported the incident to police. On recross, the witness said "I don't know what it was" when asked if he could connect the incident to the defendant.
On appeal, the defendant argues that the evidence was proof of other crimes forbidden by La. C.E. art. 404 and that it was irrelevant and more prejudicial than probative. However, nothing in the witness' testimony connected this incident to the defendant, and there was no testimony to suggest that the incident was an "attempted armed robbery by the same defendant" as the state implied. The fact that some unknown person rang the Applebee's doorbell early one morning does not amount to evidence of other crimes implicating the defendant. Any error in admitting this evidence was harmless beyond a reasonable doubt.
These assignments of error are without merit.

VIDEOTAPED STATEMENT OF ACCOMPLICE
In six assignments of error, the defendant challenges the trial court's exclusion from evidence of a videotaped statement made to defense counsel by accomplice Joseph Young.
Detective Hamm testified that he arrested both the defendant and Young on July 22, 1996, after Young told him that they were involved in the robbery. The court minutes reflect that they were referred the next day to the Indigent Defender Board, where attorney Mike Lawrence was appointed to represent both of them.
According to a statement made by defense counsel Daniel Keele during argument on the issue, he interviewed Young on August 26, 1996. Mr. Keele videotaped that interview. Mr. Lawrence stated that Mr. Keele had contacted him and obtained his permission to speak to Young, but Mr. Lawrence could not recall the date of that contact. Neither Mr. Lawrence nor Mr. Keele recalled discussing videotaping the interview.
On September 13, 1996, the defendant and Young were jointly indicted for armed robbery, and on September 16, both men, still jointly represented by Mr. Lawrence, pled not guilty. Mr. Lawrence said that the first time he had an interview with Young was on September 27. On December 2, the defendant appeared in court and for the first time was represented by Mr. Keele. On April 8, 1997, Young, still represented by Mr. Lawrence, pled guilty to conspiracy to commit armed robbery.
When Young was called to testify, the court heard arguments regarding the admissibility of the videotaped interview. The state objected to the introduction of the tape, and then Mr. Lawrence, still representing Young, formally asserted Young's attorneyclient privilege under La. C.E. art. 506 regarding the interview with Mr. Keele.[2] After argument, the court deferred ruling on the admissibility of the evidence until after the prosecution finished questioning Young. After another lengthy argument, the court ruledover the defendant's objectionthat Young's attorney-client privilege precluded the defendant from introducing the taped interview into evidence. The defendant proffered the tape into the record.
A review of the proffered videotape shows that in his interview with Mr. Keele, Young denied being involved in the robbery and stated that neither of the masked robbers resembled the defendant. These statements contradict his testimony at trial, as well as his earlier inculpatory statements to police.
On appeal, the defendant complains that the court's ruling was erroneous and denied *1073 him his constitutional right to confront the state's key witness against him. The state argues that the court's ruling was correct because Mr. Keele was ethically barred from calling himself as a witness to authenticate the tape.
These six assignments of error present two primary questions: first, whether Young had a valid attorney-client privilege with regard to the interview and second, if Young did have a valid privilege, whether he could assert that privilege in the face of the defendant's right to confrontation.
Review of these assignments of error convince us that protracted discussion of these issues is not warranted in the instant case. First, we note that the record contains insufficient evidence about the circumstances of the interview to determine whether the privilege under La. C.E. art. 506 was applicable. Furthermore, extrinsic evidence about prior inconsistent statements is admissible if the witness has failed to admit the statement when given the opportunity to do so. La. C.E. art. 613. Even on direct examination, Young freely admitted making false statements to several persons, including a reference to his prior inconsistent statement to Mr. Keele.[3] Thus, Young's videotaped statement was unnecessary and inadmissible.
Even assuming arguendo that the trial court erred in refusing to allow the jury to see the tape, such refusal was harmless beyond a reasonable doubt. Excepting the statement, the defendant was allowed the widest latitude in cross-examining Young. Indeed, even some of the privileged information was introduced into evidence even after the court's ruling recognizing the privilege:
Q (Defense counsel): The description of the people that were involved, have you ever given a description other than the one you [gave] to the police?
A (Young): Yes, sir.
Q: And what descriptions have you given and to whom?
A: To you.
This can only be a reference to the videotaped statement to Mr. Keele. The defendant elicited so much information from the witness about his prior inconsistent statements to other persons that the exclusion of the videotaped statement surely did not contribute to the verdict. The jury was well aware that Young had told several different stories, both to police and to other persons, and had lied on many occasions. Defense counsel's questioning of Young about the details of the offense lasted for approximately 22 pages of the trial transcript. The defendant also conducted a thorough cross-examination of Detective Hamm, and the jury again heard the details of the witness' prior inconsistent statements.
On both direct and cross-examination, Young admitted prior statements contrary to his trial testimony, including lies told to defense counsel. The defendant was able to adequately confront the witness about his prior inconsistent statements.
These assignments of error are without merit.

PRIOR CONVICTIONS OF ACCOMPLICE
The defendant argues that the trial court erred in restricting defense counsel's questioning of accomplice Joseph Young as to his prior convictions.
During direct examination, Young denied ever having been charged or convicted of any crime and stated that the instant case was his first time in the judicial system. On cross-examination, however, defense counsel elicited that he had previously paid a fine resulting from a marijuana charge; Young then admitted that his prior answer was a lie. Defense counsel then asked Young if he recalled being placed on probation for "whipping up" on his brother-in-law. At this point, the state objected. The court informed defense counsel that he could ask Young about prior convictions; however, he was cautioned *1074 against asking about "trouble" that might not have resulted in a conviction and to ask other questions only if the witness denied the conviction. Counsel resumed questioning the witness, and Young admitted only that he had been convicted on a marijuana charge. Counsel did not ask the witness whether he had a conviction related to the alleged battery.
La. C.E. art. 609.1 provides, in pertinent part:
A. General criminal rule. In a criminal case, every witness by testifying subjects himself to examination relative to his criminal convictions, subject to limitations set forth below.
B. Convictions. Generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.
C. Details of convictions. Ordinarily, only the fact of a conviction, the name of the offense, the date thereof, and the sentence imposed is admissible. However, details of the offense may become admissible to show the true nature of the offense:
(1) When the witness has denied the conviction or denied recollection thereof;
(2) When the witness has testified to exculpatory facts or circumstances surrounding the conviction; or
(3) When the probative value thereof outweighs the danger of unfair prejudice, confusion of the issues, or misleading the jury.
Before counsel began questioning the witness about his encounters with the law, Young had twice denied that he had ever "been in trouble." The defendant knew about the witness' conviction for marijuana, and the court allowed him to bring up details of that event such as the type of drug involved and the location of the offense.
The court limited the defendant's questioning of the witness only with reference to an incident when the witness allegedly was put on probation for "whipping up on" his brother-in-law. If this event occurred, and if Young was put on probation (i.e., was convicted and sentenced) for his part in the offense, then La. C.E. art. 609.1 would have allowed the defendant to ask the witness about the details of the event because the witness initially denied involvement. However, defense counsel never asked the witness if he had been convicted for this encounter. Furthermore, there is no evidence in this record that the defendant was convicted of a battery or anything else from this incident.[4] In the absence of a showing that Young had a prior conviction arising out of the event in question, the defendant has not shown any error by the trial court.
This assignment of error lacks merit.

MOTION FOR MISTRIAL
The defendant contends that the trial court erred in denying his motion for mistrial based upon remarks in the state's closing arguments which allegedly commented on the defendant's failure to testify.
In closing argument, the prosecutor reviewed the evidence for the jury and focused on those facts which best supported Young's story. In pertinent part, he stated:
What else do we have? We have Brandon Jackson coming back to the scene of the crime less than five hours after it is committed. Why? We don't know. But at seven (7:00) o'clock in the morning, pull up into the parking lot where a robbery had just occurred.
....
Joseph Young has said that it was Brandon Jackson who was wearing the ski mask. He recognized him by his eyes and his nose and his mouth from the planning of the robbery, from Brandon Jackson bringing him the money, giving him his thousand dollar share and then giving him the guns and telling him to get rid of the guns. Brandon Jackson shows back up at the scene less than five hours later and takes off. Brandon Jackson committed the robbery. *1075 No one has said otherwise. Only one other suspect, his brother, accounted for, Fort Polk. The only other suspect except for our unidentified. No one else. No evidence contradicting what Joseph Young has told you. That's guilty....
After argument was concluded and the jury charged and sent to deliberate, the defendant made a motion for mistrial, arguing that the state had referred to the defendant's failure to testify in its argument. The court ruled that the prosecutor's references were not directed at the defendant's failure to testify and denied the motion.
On appeal, the defendant complains that the court's ruling was in error, and that the purpose of the state's remarks was to bring attention to the defendant's failure to testify.
La.C.Cr.P. art. 770 provides, in pertinent part:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(3) The failure of the defendant to testify in his own defense....
The complained of statements were, at most, indirect references to the defendant's failure to testify. In order to mandate a mistrial under this provision, the alleged indirect reference must be intended to draw the attention of the jury to the defendant's failure to testify or present evidence in his behalf. State v. Langley, 95-1489 (La.4/14/98), 711 So.2d 651 (on original hearing); State v. Johnson, 541 So.2d 818 (La. 1989); State v. Smith, 433 So.2d 688 (La. 1983); State v. Johnson, 426 So.2d 95 (La. 1983); State v. Stephenson, 412 So.2d 553 (La.1982); State v. Curry, 390 So.2d 506 (La.1980).
As in Smith, the complained-of references were merely intended to show the jury that no evidence contradicted Young's testimony, not to emphasize the defendant's failure to testify. The defendant referred to Young as a pathological liar, and Young's testimony was critical to the state's case. The fact that no evidence materially contradicted Young's testimony was a valid point of argument, and the state's "no evidence" reference did not rise to the level of a comment warranting mistrial under La.C.Cr.P. art. 770.
This assignment of error is meritless.

HABITUAL OFFENDER STATUS
The state filed a habitual offender bill against the defendant charging that, in addition to the present armed robbery, he had been convicted of three prior offensesa 1990 attempted possession of schedule I CDS with intent to distribute (# 149,456), a 1991 possession of schedule II CDS (# 151,850) and a 1995 possession of schedule II CDS (# 173,514-A). The court conducted a hearing on the bill at which the defendant did not testify.
The state called Mark Green of the Bossier Parish Sheriff's Office (BPSO) as a fingerprint expert. Deputy Green testified that he had examined the fingerprints on the bill of information for the case sub judice, Bossier Parish # 82,978 (# S-1), and that he had compared and matched these fingerprints with the prints found on two Caddo Parish bills of information, specifically # 151,850 (plea to possession of schedule II CDS) (# S-3) and # 173,514-A (plea to possession of schedule II CDS) (# S-2).
These fingerprints also matched prints contained on the arrest record of the BPSO for the instant offense (# S-4). The state then introduced a "pen pack" consisting of the records of the Department of Corrections pertaining to the defendant (# S-5); this pen pack also contained a set of fingerprints which Deputy Green matched to the BPSO fingerprint card. The pen pack refers to Caddo Parish bills of information for Brandon Jackson, # 149,456 (1990 conviction of attempted possession of schedule I with intent to distribute) (# S-7) and # 173,514 (a charge of attempted armed robbery for which the attached minutes do not give a clear disposition, merely stating that it was "incorporated" into # 173,514-A) (# S-6). However, the copies of these bills admitted into evidence do not contain fingerprints.
The defendant objected to the introduction of the pen pack into evidence; he alleged *1076 that it did not comply with La. R.S. 15:585 and that it contained inadmissible hearsay. The defendant also objected to the introduction of # S-6 and # S-7, the bills of information for # 173,514 and # 149,456, on the grounds that they did not contain his fingerprints. He objected to # S-4, the BPSO fingerprint card, on the grounds that it was irrelevant and contained hearsay. The defendant did not allege that any of his prior pleas were invalid.
The court found that the defendant had been convicted of the instant armed robbery and of three offenses in Caddo Parish, # 173,514-A, # 151,850 and # 149,456. With this finding, and because the current crime, armed robbery, is a crime of violence, the court found the defendant to be a fourthfelony offender and sentenced him to serve life imprisonment without benefit of parole, probation or suspension of sentence under La. R.S. 15:529.1(A)(1)(c)(ii). Without citing any specific grounds, the defendant objected to the sentence and asked the court to reconsider sentence; the court denied the motion.
On appeal, the defendant raises several complaints about the habitual offender proceedings. We find no merit to his arguments.

Proof of Identity
To obtain a multiple offender conviction, the state is required to establish both the prior felony conviction(s) and that the defendant is the same person convicted of that felony. Various methods are available to prove that the defendant on trial is the same person convicted of the prior felony offense, such as the testimony of witnesses, expert opinion as to the fingerprints of the accused when compared with those of the person previously convicted, photographs contained in a duly authenticated record, or evidence of identical driver's license number, sex, race and date of birth. State v. Westbrook, 392 So.2d 1043 (La.1980); State v. Curtis, 338 So.2d 662 (La.1976). The mere fact that the defendant on trial and the person previously convicted have the same name does not constitute sufficient evidence of identity. Curtis, 338 So.2d at 664. In Westbrook, supra, the supreme court found that along with defendant's name, his driver's license number, sex, race, and date of birth were sufficient evidence for the state to carry its burden of proving that this defendant was the same person previously convicted of another felony.
The defendant's principal contention is that the state failed to prove his identity because it neglected to take his fingerprints in open court at the habitual offender hearing and to compare those prints to the prints in the exhibits. That contention is without merit. The judge who presided over the habitual offender hearing was the same judge who presided over the defendant's trial in this matter. As the court stated in State v. O'Day, 185 So. 290, 298, 191 La. 380, 406 (1938):
The record shows that the accused was tried ... and convicted ... before a jury in the court of the same judge who sentenced him. The present proceeding is a part of the original prosecution against him for that crime. State v. Guidry, 169 La. 215, 124 So. 832. Our learned brother below had the right to take judicial cognizance of any prior proceeding which was a part of the same case he had previously tried. The filing of the information was solely and only for the purpose of having the court impose a sentence upon the accused, according to the laws of this State, as a second or third offender. Therefore, proof that he was the prisoner who had been sentenced by the judge under the previous conviction by the jury was not necessary.
See also State v. Jones, 332 So.2d 461, 463 (La.1976).
The defendant's fingerprints on the bill of information in the instant case were matched to prints on the bills in # 173,514-A and # 151,850. Moreover, they were matched to prints in the defendant's pen pack which referred to his conviction in # 149,456. In light of the evidence connecting the defendant with the pen pack and the pen pack with # 149,456, the absence of fingerprints from the bill of information in # 149,456 is not fatal to the state's proof. Additionally, we observe that the pen pack included a photograph of the defendant. All of this evidence taken together was sufficient to *1077 prove the defendant's identity as the person convicted in the prior offenses.

Free and Voluntary Pleas
As noted, the defendant pled guilty to the three prior offenses relied upon by the state. On appeal, he argues that these pleas were not freely and voluntarily entered and thus may not be used as predicate offenses under La. R.S. 15:529.1.
The burden of proof for the use of such prior offenses in a habitual offender adjudication is set forth in State v. Shelton, 621 So.2d 769, 779-780 (La.1993). In this case, the state introduced proof that the defendant, represented by counsel, pled guilty to the prior offenses. No Boykin transcripts were offered. However, there was no need for such transcripts. The documents introduced by the state met the initial burden of proof required by Shelton and do not affirmatively disclose a Boykin defect. The defendant did not complain at the hearing of any such defect in his prior pleas; thus, he is not entitled to raise that complaint now. La. R.S. 15:529.1(D)(1)(b); State v. Windham, 630 So.2d 688 (La.1993).

Pen Pack
The defendant complains that the pen pack offered by the state was not admissible under La. R.S. 15:585. That statute, however, governs only the admissibility of records from the Louisiana Bureau of Criminal Identification and Information, an agency unconnected to the evidence in question. State v. Shepherd, 566 So.2d 1127, 1134 (La. App. 2d Cir.1990). The pertinent statute is La. R.S. 15:529.1(F), which provides, in part:
The certificates of the warden or other chief officer of any state prison, or of the superintendent or other chief officer of any penitentiary of this state or any other state of the United States, or of any foreign country, or of any chief officer of any parish or county jail in this state or any other state of the United States, or of the clerk of court of the place of conviction in the state of Louisiana, under the seal of his office, if he has a seal, containing the name of the person imprisoned, the photograph, and the fingerprints of the person as they appear in the records of his office, a statement of the court in which a conviction was had, the date and time of sentence, length of time imprisoned, and date of discharge from prison or penitentiary, shall be prima facie evidence of the imprisonment and of the discharge of the person, either by a pardon or expiration of his sentence as the case may be under the conviction stated and set forth in the certificate.
The pen pack introduced in this case bears the standard affidavit from the custodian of records of the Louisiana Department of Public Safety and Corrections certifying that the attached documents are true copies of that agency's records pertaining to Brandon Jackson. See, e.g., State v. White, 28,095 (La. App.2d Cir.5/8/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760. The documents were certainly relevant, and the defendant does not explain his allegation that the pen pack is hearsay. The pen pack presents no obvious hearsay problem. The court did not err in admitting this evidence.

Prior Crime of Violence
At the habitual offender hearing, the defendant argued that his conviction for attempted possession of marijuana with intent to distribute could not be used under La. R.S. 15:529.1(A)(1)(c)(ii) because it was "not punishable by imprisonment for more than five years." That contention is itself without merit; in 1990, La. R.S. 40:966(B)(2) and 14:27 provided that the penalty for the attempted violation of La. R.S. 40:966(A)(1) with respect to marijuana was imprisonment at hard labor for not more than 15 years. Regardless of the penalty for that earlier offense, however, the defendant's concern is misplaced. La. R.S. 15:529.1(A)(1)(c)(ii) reads, in pertinent part:
If the fourth or subsequent felony or any of the prior felonies is a felony defined as a crime of violence under R.S. 14:2(13) or as a violation of the Uniform Controlled Dangerous Substances Law punishable by imprisonment for more than five years or of any other crime punishable by imprisonment for more than twelve years, the person shall be imprisoned for the remainder of his natural life, without benefit of parole, probation, or suspension of sentence. [Emphasis added.]
*1078 The defendant's fourth felony, the instant crime, is armed robbery. Armed robbery is defined as a crime of violence in La. R.S. 14:2(13)(w). Each of the predicate crimes was a felony. Because the defendant is a fourth felony offender and his fourth felony is a crime of violence, La. R.S. 15:529.1(A)(1)(c)(ii) provides that his sentence is life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. The statute is neither vague nor ambiguous.

Cleansing Period
The defendant argues that his habitual offender adjudication is invalid because the state failed to prove that his prior convictions were sufficiently recent, under La. R.S. 15:529.1(C), to be used as predicate offenses. This cleansing period was fixed at 10 years when the defendant was sentenced. In the defendant's case, it is impossible that 10 years elapsed between the defendant's discharge from custody on one offense and his commission of the next offense; indeed, all of the defendant's crimes were committed within seven years of one another. The state needed to prove nothing else to satisfy its burden under La. R.S. 15:529.1(C). State v. Mayweather, 28,271 (La.App.2d Cir.6/26/96), 677 So.2d 594.

Right to Hearing / Silence
The defendant argues his adjudication is invalid because the trial court failed to advise him of his right to a hearing on the habitual offender bill and of his right to remain silent at that hearing. However, the record shows that the court did conduct a contradictory hearing on the bill and that the defendant did not testify. The state carried its burden of proof with documentation and fingerprint evidence. Accordingly, the court's omissions were harmless error. State v. Stewart, 27,049 (La.App.2d Cir.5/10/95), 656 So.2d 677, writs denied, 95-1768 & 95-1764 (La.12/8/95), 664 So.2d 420.
The defendant's habitual offender adjudication was properly conducted, and the state met its burden of proving that the defendant was a fourth felony offender with a crime of violence. This assignment of error is without merit.

EXCESSIVE SENTENCE
The defendant orally objected to the sentence after it was imposed but raised no particular grounds for his objection. On appeal, he makes a brief argument that his lifewithout-benefits sentence is unjustified, particularly in light of the penalty exposure of Joseph Young.
Since the Habitual Offender Law in its entirety is constitutional, the minimum sentences it imposes upon multiple offenders are also presumed to be constitutional. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672. Although the trial court has the authority to reduce these minimum sentences, State v. Dorthey, 623 So.2d 1276 (La.1993), this power should be exercised only when the court is clearly and firmly convinced that the minimum sentence is excessive. Johnson, supra.
Whether the sentence imposed is too severe depends on the circumstances of the case and the background of the defendant. A sentence violates La. Const. art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. Dorthey, supra; State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Bradford, 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864.
The defendant has not shown that his sentence is excessive. The circumstances of this offense were serious; the defendant armed himself with a handgun and, along with another person so armed, put the lives of several people at risk in robbing Tim Day. Further, the defendant and his companion(s) bound their victims to prevent their escape or resistance. The defendant has a history of drug-related offenses and has failed to conform his conduct to the requirements of the law despite several opportunities to do so.
There is no requirement that codefendants be sentenced equally. See, e.g., *1079 State v. Dunn, 30,767 (La.App.2d Cir.6/24/98), 715 So.2d 641. In this case, the defendant, not Mr. Young, was the person carrying the handgun and wearing the mask; further, Young cooperated with authorities to bring the defendant to justice and was allowed to plead guilty to a lesser offense.
The defendant's sentence is appropriate under the scheme of La. R.S. 15:529.1. This assignment of error is without merit.

CONCLUSION
The defendant's conviction and sentence are affirmed.
AFFIRMED.
HIGHTOWER, J., concurs with written reasons.
HIGHTOWER, J., concurring.
Defendant's evidence-sufficiency complaint, raised merely by assignment of error rather than by post-trial motion for acquittal in the district court, is not properly before us. See La.C.Cr.P. art. 821; State v. Hall, 624 So.2d 927 (La.App. 2d Cir.1993), writ denied, 629 So.2d 1182 (La.1993); Bates v. Blackburn, 805 F.2d 569 (5th Cir.1986), cert. denied, 482 U.S. 916, 107 S.Ct. 3190, 96 L.Ed.2d 678 (1987). See also discussion in concurrence to State v. Green, 28,994 (La. App.2d Cir.02/25/97), 691 So.2d 1273, and authorities therein. Thus, I do not reach that aspect of the appeal, but otherwise strongly concur in the affirmance.
NOTES
[1] Because Young was merely a witness, not a "party" to these criminal proceedings, La. C.E. art. 801(D)(2)(a) is inapplicable. Further, Young's statement to the detective did not advance the conspiracy to rob the restaurant (he had withdrawn from the conspiracy and was giving evidence to police), thus it is not admissible under La. C.E. art. 801(D)(3)(b) as a statement by a co-conspirator. See State v. Smith, 94-1221 (La. 10/7/94), 643 So.2d 1221.
[2] La. C.E. art. 506 recognizes a privilege whereby a client may refuse to disclose, and prevent another from disclosing, a confidential communication "made for the purpose of facilitating the rendition of professional legal services to the client" to a lawyer "who represents another party concerning a matter of common interest."
[3] Of particular note is the following exchange between the prosecutor and Young:

Q: Okay. Now, then, besides, uh, your attorney or another attorney that may be involved in this case, have you told other people other than Detective Hamm lies trying to cover up your involvement and trying to cover up Brandon's involvement in this robbery?
A: Yes, sir.
[4] We note that the record contains a Louisiana criminal history record check for Joseph Young, which reflects only an arrest for possession of schedule I drugs.